United States District Court
Southern District of Texas
**ENTERED**
December 19, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CASA TRADICIÓN S.A. de C.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-2972 |
| | § | |
| CASA AZUL SPIRITS, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a trademark-infringement case involving tequila. The allegedly infringed product is a brand of expensive, high-quality tequila sold in a handmade, ceramic decanter. The allegedly infringing product is a brand of inexpensive, canned tequila-based soda. The court held a hearing on the plaintiff's motion for a preliminary injunction on December 2, 2022. Based on the pleadings; the motion, response, and reply; the survey and other evidence in the record; and the applicable law, the court finds and concludes that the plaintiff has failed to show a substantial likelihood of success on the merits. Specifically, the plaintiff has not shown the likelihood of consumer confusion between the products, their ownership, sponsorship, or affiliation, necessary to secure the relief sought. The findings and conclusions are set out below.

**FINDINGS OF FACT**

**I.    The Parties**

Plaintiff Casa Tradición S.A. de C.V. is a sociedad anóma de capital variable formed under the laws of Mexico, with its principal place of business in Zapopan, Jalisco, Mexico. (Docket Entry No. 1, Compl., ¶ 2).

Defendant Casa Azul Spirits, LLC is a limited liability company organized under the laws of Delaware, with a registered address in Wilmington, Delaware. (*Id*. ¶ 3).

## II.      The Relevant Trademarks and Products

### A.      The Plaintiff's Trademark and Product

#### 1.      The Plaintiff's CLASE AZUL Trademark

In the 1990s, the plaintiff's founder decided to name his new tequila brand "Clase Azul." (Docket Entry No. 23-10, Declaration of Younga J. Kwon (Nov. 16, 2022) ("Kwon Decl.") ¶ 109, Ex. 107[1]).  The plaintiff applied to the United States Patent and Trademark Office to register CLASE AZUL as a tradename for its tequila in August 2006 and obtained its trademark registration in March 2008 (Reg. No. 3,403,628).  (Compl. ¶ 12).

The plaintiff has used its CLASE AZUL mark to sell tequila in the United States since approximately February 2003.  (Docket Entry No. 17-1, Declaration of Juan José Sánchez (Oct. 19, 2022) ("Sánchez Decl.") ¶ 16).

In 2017, the plaintiff's CLASE AZUL trademark was declared incontestable.  (Compl. ¶ 13).

#### 2.      The Plaintiff's Product

The plaintiff sells a high-quality, expensive tequila with a 40% alcohol content, under the CLASE AZUL trademark.  CLASE AZUL translates to English as "blue class."  The plaintiff's tequila is most commonly sold in tall, white 750-milliliter ceramic decanters that are hand-painted and hand-sculpted in Mexico.  An example of this decanter is shown below.  (Sánchez Decl. ¶¶ 17, 19; Docket Entry No. 23-1, Declaration of Lance Collins (Nov. 17, 2022) ("Collins Decl.") ¶ 25).

---

[1]  The exhibits to the Kwon Declaration are located at Docket Entry Numbers 23-11 and 23-12.



The plaintiff markets Clase Azul as a luxury tequila for sophisticated consumers willing and able to spend more for quality and for image.  (Docket Entry No. 23-10, Declaration of Younga J. Kwon (Nov. 16, 2022) ("Kwon Decl.") ¶¶ 107–108, Exs. 105, 106).  The price of the plaintiff's tequila products range from $120 for a "plata" tequila, to $1,799 for "extra anejo tequila," to thousands of dollars for its limited edition bottles.  (*Id*. ¶ 106, Ex. 104).  In retail stores, the plaintiff's products are often found behind the cash register, on high shelves, or in locked display cases.  (Docket Entry No. 23-4, Decl. of Lauren Cross (Nov. 16, 2022) ("Cross Decl.") ¶¶ 4–5; Docket Entry No. 23-5, Declaration of Ryan Johnston (Nov. 16, 2022) ("Johnston Decl.") ¶ 5; Docket Entry No. 23-6, Declaration of Dwayne Francis (Nov. 16, 2022) ("Francis Decl.") ¶¶ 4–5; Docket Entry No. 23-7, Declaration of Juan Barba (Nov. 16, 2022) ("Barba Decl.") ¶ 5).

### 3.      The Plaintiff's Packaging and Marketing of Clase Azul

The plaintiff's logo contains a circle, four tan leaves and four dark blue "feathered" brushstrokes mean to evoke the blue agave plant from which all tequilas are distilled.  (Collins Decl. ¶ 26); *see also* U.S. Trademark Application Serial No. 97367893 (April 18, 2022).



The CLASE AZUL trademark appears in script typeface on the back of the tequila decanter but does not appear on the front of the plaintiff's decanters.  (Collins Decl. ¶ 26).

The plaintiff markets its product as a tequila "for savoring, not mixing in a cocktail." (Kwon Decl. ¶ 107, Ex. 105).  The plaintiff's founder has publicly stated that the decanter is "not a common bottle," and that it can be "upcycle[ed]," unlike other tequila bottles in the market.  (*Id.* ¶ 110, Ex. 108).

The plaintiff's tequila appeals to an older, more affluent consumer who "can really appreciate" a high-quality tequila.  The decorative decanter makes it an appropriate gift for an adult friend or family member.  (Collins Decl. ¶ 27; Kwon Decl. ¶ 107, Ex. 105).

### B.      The Defendant's Trademark and Product

### 1.      The Defendant's CASA AZUL Trademark

The defendant has been producing beverages under the CASA AZUL brand for more than 15 years.  (Collins Decl. ¶¶ 3–4).  CASA AZUL translates to English as "blue house."  (*Id.* ¶ 4).

In April 2006, the defendant's founding family, through their company, H&L Associates, filed with the USPTO an intent-to-use application to register CASA AZUL in connection with

4

wine.  (U.S. Ser. No. 78/868,214; *see also* Collins Decl. ¶ 5).  In November 2006, the USPTO published the application, which was allowed without opposition.  (Collins Decl. ¶ 5).  H&L Associates began selling Casa Azul wine in the United States in 2007.  In May 2008, the USPTO registered the CASA AZUL trademark.  (U.S. Reg. No. 3,424,540; *see also* Collins Decl. ¶ 5).  The CASA AZUL registration was declared incontestable in 2014 and has not been challenged by the plaintiff.  (Collins Decl. ¶ 5).

### 2.      The Defendant's Product

In July 2018, H&L Associates filed an intent-to-use application with the USPTO to register CASA AZUL in connection with alcoholic beverages (except beer).  (U.S. Application Ser. No. 87/950,477).  The USPTO approved the application and published it in November 2018.  The plaintiff was aware of this trademark application for CASA AZUL for alcoholic beverages in 2018.  No one opposed the application, and the USPTO registered the trademark in November 2019.  (U.S. Reg. No. 5,921,855; *see also* Collins Decl. ¶ 6).

In March 2021, Casa Azul Spirits was formed as a Delaware LLC to develop the Casa Azul tequila soda, and the CASA AZUL trademark registrations for wine and alcoholic beverages were assigned to Casa Azul Spirits, LLC.  (Collins Decl. ¶ 9).

In September 2021, the defendant contracted to import its tequila-soda product into the United States.  (*Id.* ¶ 11).  The defendant also contracted with a distillery in Jalisco, Mexico, to produce the tequila for the tequila soda.  (*Id.*).

The defendant received the required approvals for the trademark and production of its tequila sodas from the Mexican authorities, including the Tequila Regulatory Council, which governs and enforces the Tequila Appellation of Origin through Mexico's Intellectual Property Office and the National Association of Manufacturers.  (*Id.* ¶ 12).

Starting in December 2021, the defendant began to file applications for the label approval required by the United States Alcohol and Tobacco Tax and Trade Bureau. In January 2022, the Bureau began to approve these applications and issued the approvals for the various flavors of Casa Azul tequila soda. (*Id.* ¶ 13). The approvals included images of the labels and were publicly available on the Bureau's approval database.

In June 2022, the defendant, Casa Azul contracted with a national distributor to distribute its tequila soda. (*Id.* ¶ 15).

In March 2022, after two years of investment, research and development, the defendant publicly announced on social media platforms the planned launch of its new Casa Azul ready-to-drink, canned, carbonated, 5% alcohol tequila-soda product. (*Id.* ¶ 16). The product's ingredients include tequila, sparkling water, and a range of fruit flavors. (*Id.* ¶ 16).

In July 2022, the defendant began selling Casa Azul tequila soda through retail brick-and-mortar stores, online alcoholic beverage retailers, and bars and restaurants. (*Id.* ¶ 17). Casa Azul tequila soda is currently sold in over 900 retail stores in the United States. (*Id.* ¶ 20).

### 3. The Defendant's Packaging and Marketing of Casa Azul

The defendant's logo features a teal-colored stylized outline of a double-pitched roof house with a white agave plant superimposed on it. The words "CASA AZUL" appear in capital letters below the house in a bold, serif typeface. (Collins Decl. ¶ 16).



Casa Azul tequila soda is packaged in 12-ounce metal cans that feature images of different fruits, reflecting the respective flavor of the soda.  The cans have bright teal backgrounds and accent colors, which include lime green, orange, red, and pink.  The cans display the CASA AZUL logo and the words "CASA AZUL" printed under the image of a house with a double-pitched roof.  Casa Azul is sold primarily in single-flavor four packs, mixed flavor eight packs, in teal colored cardboard boxes.  (*Id.* ¶ 16).



According to the defendant, Casa Azul is primarily intended to be purchased by consumers who are younger and less affluent than those purchasing Clase Azul tequila. (*Id.* ¶ 18).

The defendant's branding and messaging focus on the "CASA" portion of the CASA AZUL name. For example, the home page of the defendant's website, https://casaazulspirits.com/, displays the greeting "Welcome to our casa!" and shows a blue door.  (*Id.*).

The defendant's marketing uses slogans that include the following: "From our casa to yours"; "mi casa es su casa"; "step into our casa"; "one sip and you're home"; and "a house built on real."  (*Id.* ¶ 18).  The defendant uses the hashtags "#bluehousemoments" and

"#AHouseBuiltonReal," along with a house or door "emoji" paired with a solid blue diamond. (*Id.*).



C.      **Relevant Third-Party Marks for Tequila**

The defendant has submitted evidence of 37 tequila or agave-based spirits sold under trademarks that include the Spanish word "azul," including CASAZUL, CAZUL, CAMPO AZUL, CASINO AZUL, and REAL AZUL.  (*See* Kwon Decl. ¶¶ 4, 5, 6, 7, 8, 9, 10, 11, 12, 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 78, 79, 81, 82).

The defendant has submitted evidence of 32 alcoholic beverages sold under trademarks that include the Spanish word "casa," including CASAMIGOS, CASA NOBLE, CASA REAL, CASA DEL SOL, CASA MAESTRI, CASA DRAGONES, CASA DE LUNA, CASA MÉXICO, CASA VERDE, CASA PECADOS, and CASA COFRADIA.  (*See id.* ¶¶ 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 55, 61, 62, 77, 80).

Some of these trademarks have coexisted with the plaintiff's products since at least 2012. For example, United States Distilled Products Co., owns the registered United States trademark CAZUL 100. The mark was registered in February 2012. United States Distilled Products Co. sells its tequila under the CAZUL mark in the United States. The plaintiff did not oppose the company's application to register CAZUL 100 for alcoholic beverages, including tequila. The plaintiff's Clase Azul and the United States Distilled Products Co.'s Cazul tequilas have been sold for approximately a decade. (*Id.* ¶ 45, Ex. 43A).

Another third party, Casazul S.A. de C.V., owns the registered United States trademark CASAZUL, which covers a distilled blue agave liquor (a descriptive term for tequila). This mark was registered in October 2020. Casazul S.A. de C.V sells tequila under the CASAZUL mark in the United States. The plaintiff did not oppose Casazul's application to register CASAZUL for its distilled blue agave liquor. The plaintiff and Casazul have sold tequila for at least two years. (*Id.* ¶ 43, Ex. 41A).

## III.    The Parties' Dispute

In July 2021, the defendant applied to register CASA AZUL as a trademark for beer, beer-based cocktails, beer-based coolers, and flavored beers. The USPTO approved that application and published it in May 2022. (Collins Decl. ¶ 22). The plaintiff opposed that application before the Trademark Trial and Appeal Board in June 2022. (*Id.*).

In September 2022, the plaintiff filed this lawsuit, citing in the same evidence of confusion that it submitted to the Trademark Trial and Appeal Board. In October 2022, the plaintiff applied for an injunction to prevent the defendant from using the CASA AZUL trademark for its tequila soda. (Docket Entry No. 17).

A.      **Social Media Evidence**

The plaintiff submitted evidence that, as of June 2022, the defendant's Instagram account, @casaazulspirits, had been "tagged" by Instagram users in 30 posts, each showing photos or videos of the plaintiff's Clase Azul product.  (Docket Entry No. 1-8; 17-2, Declaration of Brandon T. Cook (Oct. 17, 2022) ("Cook Decl.") ¶ 6).  The plaintiff submitted an additional two posts showing photos of fingernails painted to look like the plaintiff's product but tagging the defendant's @casaazulspirts account.  (*Id.*)  The plaintiff contends that these posts evidence actual consumer confusion.  (Docket Entry No. 17 at 18).

The defendant disputes that these posts are evidence of actual confusion.  The defendant submitted a declaration from its Social Marketing Manager, Connor Dowd, who explains that "tagging" on Instagram may result from reasons other than actual confusion.  According to Dowd, there is no way for someone reviewing a "tagged" photo to know why a user chose the particular "tag."  (Docket Entry No. 22-3, Declaration of Connor Dowd (Nov. 16, 2022) ("Dowd Decl.") ¶ 5).  For example, a user may have typed the account name or may merely have typed a few letters of that account name and selected an account from an automatically generated menu.   (*Id.* ¶ 4).  The plaintiff identified posts showing Clase Azul tequila but that tagged the defendant's account, but the contents of those posts suggest that the posters knew that they were discussing the plaintiff's tequila.  The record does not show evidence of Instagram or other social-media posts that state or suggest that the defendant's Casa Azul products are affiliated with the plaintiff or are made with the plaintiff's tequila.

The plaintiff argues that third-party trademarks such as CASAZUL are irrelevant because consumers are not erroneously tagging those third-party brands with the defendant's hashtag. (Docket Entry No. 17 at 14–15).  But the record shows that social-media users have "tagged" images of the plaintiff's products (or fingernails painted to look like the plaintiff's trade dress)

10

with some of these third-party marks including @tequilacasazul, which is the official Instagram account for Casazul tequila, or with the similar hashtag #casazul and #tequilacasazula.  Again, the social-media posts may not reflect actual confusion, but user carelessness in "tagging."

**B.     Survey Evidence**

The defendant submitted the declaration of Matt Ezell, who designed and conducted a survey to assess whether consumers of ready-to-drink canned, carbonated cocktails were likely to mistakenly believe that the defendant's Casa Azul tequila soda is made from, produced by, sponsored or approved by, or has a business affiliation or business connection with, the plaintiff. (Docket Entry No. 23-8, Declaration of Matthew G. Ezell (Nov. 16, 2022) ¶¶ 1–7).

The survey used the "Eveready" methodology for assessing the likelihood of consumer confusion.  In the survey, prospective purchasers of canned carbonated cocktail beverages were shown the defendant's Casa Azul product and asked a series of questions about their understanding of the product.  Fewer than one percent (0.33%) of those surveyed believed that the defendant's Casa Azul tequila soda came from, was affiliated with, or was sponsored by, the plaintiff.  (*Id.* ¶¶ 6, 32).

The plaintiff submitted the declaration of Dr. Isabella Cunningham, critiquing four aspects of Mr. Ezell's survey.  (Docket Entry No. 28-1, Declaration of Dr. Isabella Cunningham (Nov. 22, 2022) ¶ 6).  Mr. Ezell submitted a rebuttal declaration, explaining that his survey followed the long-accepted Eveready methodology for assessing whether confusion is likely, and that a control group was unnecessary because there was no threshold showing of confusion.  (*See* Docket Entry No. 31, Rebuttal Declaration of Matthew G. Ezell).  Mr. Ezell also explained that his survey questioned prospective purchasers of canned cocktails as the consumers targeted by the defendant's Casa Azul canned tequila soda cocktails.  (*Id.* ¶ 16–20).  The Ezell survey is evidence

11

that the defendant's Casa Azul product is not likely to cause confusion with the plaintiff's Clase Azul product.

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Venue

The plaintiff alleges trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); false designation of origin and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and trademark infringement and unfair competition under Texas common law.

The court has subject-matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and has supplemental jurisdiction under 28 U.S.C. § 1367(a).

The defendant is subject to personal jurisdiction because it conducts business in the State of Texas.  TEX. CIV. PRAC. & REM. CODE § 17.042.

Venue is proper under 28 U.S.C. §§ 1391(b) and (c), because the defendant does business in this district.

### II.    Analysis

"For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest."  *Harrison v. Young*, No. 19-10874, 2022 WL 3906582, at *3 (5th Cir. Aug. 31, 2022) (citing *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017)).  A preliminary injunction is "an extraordinary remedy which should not be granted unless the party seeking it has clearly carried [its] burden of persuasion."  *Future Proof Brands, LLC v. Molson Coors Bev. Co.*, 982 F.3d 280, 288 (5th Cir. 2020) (internal citations omitted).

12

**A.     The Plaintiff Is Not Likely to Succeed on the Merits of Its Trademark-Infringement or State-Law Claims**

To show that it is likely to succeed on the merits, the plaintiff must show that "[the defendant's] use of [its] trademark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc*., 851 F.3d 440, 450 (5th Cir. 2017) (quoting reference omitted).  The plaintiff has shown, and the defendant does not dispute, the validity of the plaintiff's CLASE AZUL mark.

"[A]s a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Mfg. Co. v. Enerlite Prods. Corp*., 767 F.2d 214, 217 (5th Cir. 1985).  "The elements of common law trademark infringement under Texas law are the same as those under the Lanham Act." *Streamline*, 851 F.3d at 450 (citing *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

"Likelihood of confusion" is the "paramount question" in a trademark-infringement action. *Id.* at 453.  "Likelihood of confusion is synonymous with a probability of confusion, which is more than mere possibility of confusion." *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist*., 912 F.3d 805, 812 (5th Cir. 2019) (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)).  Likelihood of confusion is assessed using the following factors, also called "digits of confusion":

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,]' . . . [and] (8) the degree of care exercised by potential purchasers.

*Streamline*, 851 F.3d at 450 (quoting *Bd. of Supers. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)).  No single factor is dispositive.  *Id.*

### 1.      The CLASE AZUL Trademark Is Not Strong

In considering the strength of a mark, the Fifth Circuit analyzes "(1) the mark's position along the distinctiveness spectrum, and (2) the standing of the mark in the marketplace." *Springboards*, 912 F.3d at 814 (quoting reference omitted).  The strength of a mark depends on whether the mark is classified, from least protectable to most protectable, as: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.  *Future Proof Brands*, 982 F.3d at 290.

Arbitrary or fanciful marks have no relation to the trademarked product.  *Springboards*, 912 F.3d at 814.  Suggestive and descriptive marks suggest or describe attributes of the product. Suggestive marks "suggest" a particular attribute but "require[] the consumer to exercise his imagination to apply the trademark to the good." *Id*.  Descriptive marks more directly "convey[] information about the product or service." *Id*.  Descriptive marks are "comparatively weak." *Future Proof Brands*, 982 F.3d at 292.  If the common element in the conflicting marks is suggestive or descriptive of the [product], this lessens the likelihood of confusion." 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:48 (5th ed.) (collecting cases).

The plaintiff argues that its CLASE AZUL mark is arbitrary because it is merely an "aesthetically appealing combination of two terms." (Docket Entry No. 17 at 12).  This argument fails to account for the association between the word "azul" and the blue weber agave plant from which tequila is made.  Taken as a whole, the plaintiff's mark both describes the product's derivation from the blue agave plant and its high quality.  The CLASE AZUL mark is descriptive as applied to the plaintiff's luxury tequila product.  Such descriptive marks are weak.

Marketplace recognition depends on public recognition and uniqueness. *Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of Law, Inc*., 214 F. Supp. 3d 573, 585 (S.D. Tex. 2016). Although the plaintiff has sold its premium tequila for years, the record evidence does not demonstrate that the CLASE AZUL mark is widely recognized, even among tequila drinkers.

14

Instead, the evidence shows that the plaintiff's product is recognized through its distinctive packaging. The lack of recognition of the CLASE AZUL trademark relative to the product's highly recognizable trade dress also points to the weakness of the mark.

Finally, the strength of the CLASE AZUL mark is diminished by the evidence of extensive third-party use of similar terms in the relevant market. "Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user." *Springboards*, 912 F.3d at 815. The record evidence shows approximately 80 tequilas that are sold or marketed in the United States under trademarks that include the words "casa," "clase," or "azul." (*See* Kwon Decl. ¶¶ 3–82). This evidence weighs against finding that the CLASE AZUL mark is strong. *See Amstar Corp. v. Domino's Pizza, Inc*., 615 F.2d 252, 259–60 (5th Cir. 1980) (evidence of 72 third-party registrations and 15 third-party uses of the DOMINO mark, for both related and unrelated goods, limited the protection that mark).

### 2. "CASA AZUL" and "CLASE AZUL" Are Dissimilar in Appearance, Sound, and Meaning

Courts examine the next digit of likelihood of by "comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters*.141 F.3d at 201. Similarity is assessed by comparing the marks as a whole, not by isolating their constituent elements. *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317–18 (5th Cir. 1981).

The marks share the Spanish word "azul," which is a descriptive word used by a number of tequila brands. Although the marks share the word "azul," this commonality is not determinative. *See, e.g.*, *Water Pik, Inc. v. Med-Systems, Inc*., 726 F.3d 1136, 1156 (10th Cir. 2013) ("SinuSense" and "SinuCleanse" sound different despite the use of "Sinu" in both marks); *Sun Banks*, 651 F.2d at 318 ("SUN BANKS" and "SUN FEDERAL" were not similar in appearance given the "significant" fact that neither party used the shared word by itself.).

15

Both the first and second syllables in the words "Clase" and "Casa" sound different, diminishing the likelihood of confusion. *Cf. Humble Oil & Ref. Co. v. Am. Oil Co.*, 405 F.2d 803, 814 (8th Cir. 1969) (initials "S O" and word "Esso" confusingly identical in pronunciation). "Clase" is pronounced as "KLA-say," "casa" is pronounced as "KA-sah." Whatever the sonic similarities of these two words, those similarities "in no way compel[] the conclusion" that they are "confusingly similar." *Future Proof Brands*, 982 F.3d at 295 (discussing the sound of the trademarks BRIZZY and VIZZY).

What words mean, in addition to how they sound and appear, matters. *See, e.g.*, *Seven-Up Co. v. Tropicana Products, Inc.*, 356 F.2d 567, 568 (C.C.P.A. 1966) ("[T]he meaning of words in trademarks is often an important consideration in determining whether likelihood of confusion exists."); *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 775 (S.D. Tex. 2005), *aff'd*, 205 Fed. Appx. 289 (5th Cir. 2006) (finding that meaning of "Star Bock Beer" "could easily be distinguished" from "Starbucks"). Here, the meanings of the two word marks are dissimilar. "Clase" is translated from Spanish as "class," "casa" as "house." Courts have found no likelihood of confusion between foreign-language words that, despite sounding similar, have different meanings when translated to English. *See, e.g.*, *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. C 05-0587 MHP, 2005 WL 701599, *5 (N.D. Cal. Mar. 23, 2005) (The word marks "ménage à trois" and "mélange de trois" for wine were "distinctly different" because even though they sounded similar, they had dissimilar meanings when translated from French.); *see also La Mexicana, Inc. v. Sysco Corp.*, No. C97-562R, 1998 WL 929629, at *4 (W.D. Wash. May 27, 1998) ("CASA is easily translated by non-Spanish speaking consumers.").

While it is true that trade dress is "not the sole or always the most important factor" in trademark-infringement cases, *Marathon*, 767 F.2d at 219, "courts consider marks in the context

16

that a customer perceives them in the marketplace, which can include labels, packages, or advertising material directed to the goods." *Future Proof Brands*, 982 F.3d at 295 (modifications, quotation marks, and citation omitted) (holding the district court did not err in "focus[ing] on certain visual differences in *product packaging*").   Each party uses distinct logos, coloring, packaging, and branding for its products.  Most obviously, the plaintiff's tequila is sold in a hand painted ceramic decanter; the defendant's tequila soda is packaged in an aluminum can, like a nonalcoholic soda or beer.  *See Myo, LLC v. Brull & York, LLC*, No. 18-cv-370, 2019 WL 136820, *5 (W.D. Tex. Jan. 8, 2019) (finding no similarity when the parties used "entirely different logos, font, and coloring in their branding").

The overall impression of the two marks is that they, and the products for which they are used, are dissimilar and readily distinguishable.  A reasonable consumer would not think that the products come from the same source or affiliated sources.

### 3.   The Parties' Products Are Dissimilar

The defendant's flavored tequila soda is a 5% alcohol, canned, carbonated beverage that is sold for a few dollars per 12-ounce can, in colorful boxes holding four or eight cans.  The plaintiff's tequila is 40% alcohol and sold in a hand-sculpted and painted ceramic decanters.  The plaintiff's tequila sells for more than $100 per bottle, with limited edition bottles costing thousands of dollars.  The high price of the plaintiff's tequila means that it is often displayed in locked display cases or securely behind a store counter.  The defendant's canned tequila soda is sold on readily accessible shelves or in refrigerators with other less expensive beverages.

The plaintiff has presented evidence that alcoholic spirit producers may also develop or sell canned alcoholic beverage products under the same brand.  But the defendant has presented evidence of numerous canned tequila products that are not made by, or affiliated with, a company that also produces and sells pure tequila spirit.  (Kwon Decl. ¶¶ 83–105).  And many canned

17

beverage products made by companies that also make liquor are easily recognizable as affiliated with their spirit counterparts through similar imagery, color schemes, logos, and names.  By contrast, the parties' products do not share imagery, color schemes, or logos.  The product names, while similar, are still plainly different in sound, appearance, and meaning.

The differences between the products "reduce the likelihood of confusion in the minds of potential purchasers."  *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 172 (5th Cir. 1986).

### 4.      There Is No Actual Confusion

The Ezell survey indicates minimal, if any, confusion between the CLASE AZUL and CASA AZUL marks in the marketplace.  *See Henri's Food Prods. Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 358 (7th Cir. 1983) (a survey showing 7.6% confusion weighs against finding infringement).  Dr. Cunningham's criticism of that survey is unpersuasive and, in any event, does not itself show a likelihood of confusion.  Given the results of the Ezell survey, the plaintiff's failure to conduct a survey of its own undermines its claim of likely confusion.  *See, e.g.*, *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) ("[The plaintiff's] failure to present its own consumer survey weighs against a finding of consumer confusion.").  Additionally, the record shows no evidence that confused purchasers have contacted the defendant to return or complain about the plaintiff's product, or that anyone has expressed the belief that the defendant is associated with the plaintiff.

The plaintiff argues that Instagram images of its Clase Azul product that were "tagged" with the defendant's Instagram username are evidence of actual confusion.  While the Fifth Circuit has "set a low bar" for establishing actual confusion, *Streamline*, 851 F.3d at 457, a showing of confusion requires more than a "fleeting mix-up of names."  *Id.* (confusion must be caused by the trademark used and must "sway" consumer purchases (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 230 (5th Cir. 2009))).

The defendant's evidence regarding mistaken Instagram "tags" does not establish a likelihood of trademark confusion that would result in purchase decisions based on the mistaken belief that the defendant's tequila-soda product is affiliated with the plaintiff.  *See id*.  The plaintiff argues that even "accidental and incorrect" "tagging" on social media shows that social media users were "actually confused into believing Defendant's CASA AZUL Instagram page was affiliated with Plaintiff's CLASE AZUL trademark."  (Docket Entry No. 28 at 6).  But again, typographical errors or accidental clicks, without more, are not evidence of actual confusion. The Instagram users who tagged the defendant may not have even visited the defendant's Instagram page, given the fact that the account was seldomly used before June 2022.  (Dowd. Decl. ¶ 7).

The fact that the defendant changed the settings on its Instagram account to prevent unrelated posts from appearing on its Instagram "tagged" page is evidence that the defendant took steps to reduce any risk of actual confusion.  The social-media evidence shows no significant risk that consumers would mistake the defendant's inexpensive, low-proof canned tequila soda for the plaintiff's 80-proof, expensive tequila sold in its distinctive decanter.  At best, the plaintiff's evidence demonstrates a "fleeting mix-up of names," which is not evidence of actual confusion. *Streamline*, 851 F.3d at 457.

The Second Circuit's recent decision in *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021), is persuasive.  The court rejected the plaintiff's argument that evidence of social media users tagging the defendant, when they intended to tag the plaintiff, showed actual confusion.  *Id.* at 397.  The court explained that "these instances of general mistake or inadvertence—without more—do not suggest that those potential consumers in any way confused [plaintiff's] and [defendant's] products, let alone that there was confusion that could lead to a diversion of sales, damage to goodwill, or loss of control over reputation."  *Id.* (internal quotation

marks omitted); *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) ("To prove infringement, [the defendant] must ultimately prove that a misleading representation by [the defendant], as opposed to some other source, caused a likelihood of confusion.").

Given the defendant's survey evidence and the absence of persuasive evidence of confusion, the actual confusion digit favors the defendant. *See Action Ink, Inc. v. Anheuser-Busch, Inc.*, 959 F. Supp. 2d 934, 947 (E.D. La. 2013), *aff'd sub nom. Action Ink, Inc. v. N.Y. Jets, LLC*, 576 F. App'x 321 (5th Cir. 2014) (absence of evidence of actual confusion "militate[d] strongly against a finding of likelihood of confusion").

**5.     The Defendant Adopted the CASA AZUL Mark in Good Faith**

The "intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Myo,* 2019 WL 136820 at *6 (quoting *Streamline*, 851 F.3d at 455).

The defendant's 2006 CASA AZUL trademark application for wine was filed four months before the plaintiff filed its intent-to-use application for CLASE AZUL in the United States.  For more than fifteen years, the defendant and its predecessor sold Casa Azul wine throughout the United States.  The defendant's expansion into the canned cocktail soda market represents an attempt to capitalize on its existing brand and reputation, rather than an attempt to derive benefits from the plaintiff's brand.

The record indicates that the defendant had no intent to trade on the plaintiff's reputation, but rather to trade on the longstanding reputation of its own Casa Azul products.  This factor favors the defendant. *Streamline*, 851 F.3d at 456–57 (because there was no intent to confuse, "this digit weighs against finding a likelihood of confusion").

###### 6.     The Parties Target Different Consumers

"Differences in the parties' customer bases can lessen the likelihood of confusion." *Healix Infusion Therapy, Inc. v. Healix, Inc*., No. CV H-17-357, 2018 WL 1801149, at *14 (S.D. Tex. Apr. 16, 2018); *see also Amstar*, 615 F.2d at 262 (noting that the "substantial dissimilarities between the predominant purchasers of plaintiff's and defendant's products" lessen the possibility of confusion).  The plaintiff's product and the defendant's product are marketed toward different consumer segments within the broader market for alcoholic beverages.

The defendant's product appeals to young drinkers looking for an inexpensive drink in casual settings.  In contrast, the plaintiff's tequila is a luxury product, appealing to the affluent customer who "can really appreciate" luxury tequila, and has been served at settings such as "movie premieres, the Screen Actors Guild Awards and celebrity parties."  (Kwon Decl. ¶ 107, Ex. 105 (Katy Scott, *The Tequila That Costs $30,000 a Bottle*, CNN WIRE (July 5, 2017)).

The differences between the targeted and likely consumers of the parties' products make this factor weigh in favor of the defendant.

###### 7.     The Parties Use Different Marketing Strategies, Messaging, and Store Placement

Both parties use social media and websites to advertise their products, but the parties' distinct marketing strategies and messages weigh against finding overlap that would result in consumer confusion.  *Quantum Fitness Corp. v. Quantum LifeStyle Centers, LLC*, 83 F. Supp. 2d 810, 827 (S.D. Tex. 1999) ("[T]he greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion.").

The defendant's marketing emphasizes the "casa" portion of its mark.  For example, the defendant's website greeting is the phrase, "Welcome to our casa!" shown with a blue door.  The defendant uses the slogans "from our casa to yours," "mi casa es su casa," or "step into our casa,"

21

and encourages consumers to use the hashtag, "AHouseBuiltOnReal." (Collins Decl. ¶ 18).  On the other hand, the plaintiff's marketing focuses on celebrating Mexican culture, in part by highlighting the work of its artisans in making its ceramic decanters. (Docket Entry No. 17 at 5, 7).

The store placement of the parties' products further weighs against a likelihood of confusion.  *See Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 296 (S.D.N.Y. 2003) (the plaintiff's and the defendant's magazines were sold in the same retail outlets, but were "unlikely to appear in physical proximity to each other at such outlets," which favored the defendant); *see also Sunenblick v. Harrell*, 895 F. Supp. 616, 639 (S.D.N.Y. 1995) (two records "sold in separate sections of [the same] record stores" were not "commercially proximate," which favored the defendants).  For example, the plaintiff's tequila product is found behind the cash register, or showcased in locked display cases. (Cross Decl. ¶¶ 5, 8; Johnston Decl. ¶ 5; Francis Decl. ¶¶ 4–7). The defendant's cans, in contrast, are found in large aisle displays, stacked in boxes or in refrigerators alongside other ready-to-drink canned cocktails and sodas. (Collins Decl. ¶ 17; Cross Decl. ¶ 8).

The distinctions between the parties' advertising favor the defendant.

**8.     The Plaintiff Offers No Evidence of Care Exercised by Purchasers**

The eighth digit examines the degree of care exercised by potential purchasers.  This digit is often linked to the price of the product.  *Streamline*, 851 F.3d at 458.  However, the Fifth Circuit has "never concluded that a low price is *sufficient* to establish a dearth of care. In fact, [courts] often rely on affidavits or testimony to show a lack of consumer care." *Future Proof Brands*, 982 F.3d at 297.  That a product is "inexpensive only supports a conclusion that those consumers may take less care in selecting the items." *Buzzballz, LLC v. JEM Beverage Co., LLC*, No. 3:15-cv-588-L, 2015 WL 3948757, at *5 (N.D. Tex. June 26, 2015) (emphasis in original).

22

The plaintiff has offered no testimony or evidence concerning consumer care, making this digit of little relevance to the court's analysis.  If anything, the high price of the plaintiff's tequila spirit means that its customers would likely take great care to ensure that the product they are buying is the Clase Azul product that they expect.

**B.** **The Plaintiff Has Not Shown That It Faces Irreparable Harm**

The plaintiff argues that, in the absence of an injunction, there will be an "unexplained market void" and it will be required to issue "corrective marketing measures."  (Docket Entry No. 17 at 20).  This speculation as to future harm does not show a "presently existing actual threat" of irreparable harm necessary for the court to award injunctive relief.  *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (quoting reference omitted); *see also Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("A presently existing actual threat must be shown.").

**C.** **The Balance of Hardships Favors the Defendant**

In contrast to the plaintiff's speculative harm from the defendant's continued sale of its canned tequila sodas, the defendant would suffer real, concrete harm were the court to issue a preliminary injunction.

The defendant has invested heavily in extensive efforts to design, manufacture, distribute and launch its tequila soda, including investments in materials, research and development, and vendor contracts.  (Collins Decl. ¶ 31).  In addition to losing the goodwill built around the CASA AZUL mark, an injunction would keep the defendant out of the market for at least 12 to 18 months and would cost a significant amount for the defendant to select a new name, develop new branding and packaging, file new trademark applications, obtain new regulatory approvals to sell product under the new name, including seeking approvals from the Mexican authorities.  *Id*.

The court is persuaded that an injunction would not only destroy the goodwill that the defendant has built around the CASA AZUL mark for tequila soda, but, because the rebranding

23

and approvals process would take over a year, would also effectively force the defendant out of the market for an extended period. Because there is no guarantee that the defendant could successfully reenter the beverage market after an extended absence, an injunction could effectively put the defendant out of business.

The plaintiff argues that the fact that the defendant sold wine for years belies its claim that it would be financially ruined if it was forced to change the mark on its tequila soda. (Docket Entry No. 28 at 20). This argument is unconvincing. The defendant has detailed the extensive investments it made in its tequila-soda product over the last few years. Leaving the defendant without a way to recoup those investments could prove devastating.

In addition, there would be "immediate financial and technical costs associated with the logistics of renaming" the defendant's products and "redesigning all materials." *FirstBank Southwest v. Heartland Fin. USA, Inc.*, No. 2:21-cv-024-Z, 2021 WL 3743806, at *7 (N.D. Tex. Aug. 24, 2021) (denying a motion for preliminary injunction and finding that "[t]he costs associated with . . . renaming . . . may have the effect of making the preliminary injunction a permanent injunction, which propounds the prudence of not issuing a preliminary injunction."). The defendant would lose its current inventory would be required to change its mark at great cost.

The financial harm that the defendant would suffer were the court to issue a preliminary injunction outweighs the harm that the plaintiff claims it would incur from the absence of an injunction.

### D.    The Public Interest Would Be Disserved by a Preliminary Injunction

The plaintiff's failure to prove a likelihood of confusion is also a failure to show that the public interest favors the issuance of a preliminary injunction. *See, e.g.*, *Brennan's, Inc. v. Brennan*, 289 F. App'x 706, 708 (5th Cir. 2008) ("[A]llowing Appellees to use their own last name in connection with their restaurant when there is a low likelihood of confusion would not disserve

the public interest."); *Bear Republic Brewing Co. v. Cent. City Brewing Co.*, 716 F. Supp. 2d 134, 152 (D. Mass. 2010) ("Since [the plaintiff] has not shown a likelihood of succeeding on the merits in establishing its infringement claims, to enjoin [the defendant] from selling RED RACER in the United States would not serve the public interest.").

## III.   Conclusion

The court denies Casa Tradición's motion for a preliminary injunction.  (Docket Entry No. 17).

SIGNED on December 19, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge