## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| Casa Tradición S.A. de C.V., | |
| Plaintiff, | |
| | Civil Action No. 4:22-cv-02972 |
| | JURY TRIAL DEMANDED |
| v. | |
| Casa Azul Spirits, LLC, | |
| Defendant. | |

## PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF DEFENDANT'S EXPERT MATTHEW G. EZELL

## Table of Contents

I.    Introduction ........................................................................................................ 1

II.   Stage of the Proceeding ..................................................................................... 2

III.  Issue Presented ................................................................................................... 2

IV.  Legal Standard: Rule 702 .................................................................................. 2

V.   Background Facts Bearing on Admissibility .................................................... 4

   A.   Defendant did not have a CASA AZUL bottled tequila product on the market when the Ezell Surveys were conducted ................................................................................... 4

   B.   People mistakenly refer to Plaintiff or its CLASE AZUL tequila as "Casa Azul." ............ 4

VI.  The *Eveready* Methodology Employed in the Ezell Surveys ................................ 6

   A.   The origin of the *Eveready* survey format and how it works .............................. 6

   B.   The *Eveready* format Mr. Ezell used. ................................................................ 8

VII. Arguments and Authorities ............................................................................ 10

   A.   For *Eveready* to be an effective survey methodology, the survey participants must be aware of the senior user's brand and able to identify the brand from memory. ....................... 11

   B.   Mr. Ezell admits the Ezell Survey participants may have failed to identify CLASE AZUL because the participants were unfamiliar with CLASE AZUL. .............................. 12

   C.   The Ezell Surveys did not account for the marketplace reality that many consumers mistakenly refer to Plaintiff's CLASE AZUL tequila as "casa azul." ..................... 13

      1.   Demonstrated examples from the Canned Products Survey where respondents referred to Plaintiff as "Casa Azul." .............................................................................. 13

      2.   Demonstrated examples from the Bottled Products Survey where respondents referred to Plaintiff as "Casa Azul." ............................................................................ 16

      3.   The implication of the above examples ................................................. 18

   D.   The Ezell Surveys did not ask the "products" question. ..................................... 20

   E.   The Ezell Surveys did not allow respondents to explain why they did not know answers to the questions. ................................................................................................................ 20

   F.   Mr. Ezell did not consider product proximity when selecting his survey design. .......... 21

   G.   The Ezell Canned Products Survey sampled the wrong universe ........................ 22

VIII. CONCLUSION ................................................................................................ 25

## Table of Authorities

<u>Cases</u>

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
  550 F.3d 465 (5th Cir. 2008) ................................................................................. 6

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252 (5th Cir. 1980) ............................................................................... 23

*Bank of Tex. v. Commerce Southwest, Inc.*,
  741 F.2d 785 (5th Cir. 1984) ............................................................................... 10

*Big Dog Motorcycles. L.L.C. v. Big Dog Holdings, Inc.*,
  402 F. Supp. 2d 1312 (D. Kan. 2005) .................................................................. 24

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) .................................................................................. 3

*Exxon Corp. v. Texas Motor Exch.*,
  628 F.2d 500 (5th Cir. 1980) ................................................................................. 6

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) .............................................................................................. 3

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ................................................................................. 2

*Kozak v. Medtronic, Inc.*,
  512 F. Supp. 2d 913 (S.D. Tex. 2007) ................................................................... 3

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .............................................................................................. 3

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
  502 F.3d 504 (6th Cir. 2007) ............................................................................... 24

*Lon Tai Shing Co. v. Koch+Lowy*,
  21 U.S.P.Q.2d 1858 (S.D.N.Y. 1992) ................................................................... 24

*Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.*,
  121 U.S.P.Q.2d 1477 (T.T.A.B. 2017) ................................................................. 25

*Moore v. Ashland Chem., Inc.*,
  151 F.3d 269 (5th Cir. 1998) ................................................................................. 3

*Rimowa Distrib. v. Travelers Club Luggage, Inc.*,

    217 F. Supp. 3d 400 (D. Mass. 2016) ................................................. 24

*Scott Fetzer Co. v. House of Vacuums, Inc.*,

    381 F.3d 477 (5th Cir. 2004) ........................................................... 10

*Union Carbide Corp. v. Ever-Ready, Inc.*,

    531 F.2d 366 (7th Cir. 1976) ..................................................... 6, 7, 20

*United States v. Hernandez-Acuna*,

    202 F. App'x 736 (5th Cir. 2006) ...................................................... 3

*Valador, Inc. v. HTC Corp.*,

    242 F. Supp. 3d 448 (E.D. Va. 2017) .................................................. 6

*Viacom Int'l, Inc. v. IJR Capital Invs., L.L.C.*,

    891 F.3d 178 (5th Cir. 2018) ............................................................ 6

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,

    744 F. Supp. 1259 (S.D.N.Y. 1990) .................................................. 24

Statutes

FED. R. EVID. 702 .............................................................................. 3

Other Authorities

Hal Poret, *An Empirical Assessment of the Eveready Survey's Ability to Detect Significant*

    *Confusion in Cases of Senior Marks That Are Not Top of Mind*, 109 THE TRADEMARK

    REPORTER 935, 937 (2019) ("Poret Article") ............................................. 11, 22

Treatises

6 THOMAS McCARTHY, TRADEMARKS & UNFAIR COMPETITION § 32.159 (5th ed. 2017) ........... 22

6 THOMAS McCARTHY, TRADEMARKS & UNFAIR COMPETITION § 32.174 (5th ed. 2017) ............. 6

FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 377 (3d ed. 2011) ............. 23

Plaintiff, Casa Tradición S.A. de C.V. ("Casa Tradición") moves to exclude the expert report and testimony of Defendant's trademark survey expert, Matthew Ezell. In support of this motion, Plaintiff sets forth the following:

## I.     Introduction

This case concerns trademark infringement. Casa Tradición has produced and sold a distilled tequila spirit in the United States under its CLASE AZUL trademark for two decades. (Doc. 17-1) ¶ 16. Casa Tradición filed this case against Defendant, Casa Azul Spirits, LLC, on September 1, 2022, shortly after Defendant began selling a canned, ready-to-drink tequila soda product under the confusingly similar trademark CASA AZUL. (Doc. 1). During the pendency of this case, Defendant expanded its product line to include a CASA AZUL distilled tequila spirit product.

Defendant's counsel engaged Matthew G. Ezell to conduct consumer perception surveys to assess whether Defendant's CASA AZUL trademark is likely to cause confusion with Plaintiff's CLASE AZUL trademark. *See* **Exhibit 1** to Declaration of Edward. B. Marvin, (Expert Report of Matthew G. Ezell dated April 10, 2023 ("Ezell Report") ¶ 2).[1] Mr. Ezell was engaged shortly after Plaintiff filed an opposition proceeding against one of Defendant's trademark applications in the Trademark Trial and Appeal Board ("TTAB") on June 21, 2022. (Doc. 57) ¶ 42. Mr. Ezell collected some of the data for his surveys at that time.

Mr. Ezell conducted two surveys which he refers to as (1) the "Canned Products Survey" and (2) the "Bottled Products Survey." Ezell Report ¶ 4. The Canned Products Survey was purportedly "designed to determine whether relevant consumers are likely to mistakenly believe

---

[1] Hereinafter, all citations to Exhibits in this Motion are in reference to the exhibits attached to the Declaration of Edward. B. Marvin.

that Defendant's canned tequila soda ready-to-drink cocktail is made or put out by, has the sponsorship or approval of, or has a business affiliation or connection with, Plaintiff." *Id.* ¶ 5. The Bottled Products Survey was purportedly "designed to determine whether relevant consumers are likely to mistakenly believe that Defendant's bottled tequila is made or put out by, has the sponsorship or approval of, or has a business affiliation or connection with, Plaintiff." *Id.* ¶ 6. Both Ezell Surveys used the *Eveready* survey methodology. *Id.* ¶ 7.

As more fully discussed below, both Ezell's Canned Products Survey and Ezell's Bottled Products Survey, as well as any opinion testimony related thereto, should be excluded due to a flawed design and execution. The reasons for exclusion include: (1) Mr. Ezell did not establish the *Eveready* format fits this case; (2) the Ezell Surveys did not properly account for marketplace conditions; (3) the Ezell Surveys did not ask the proper questions for an *Eveready* survey; and (4) the Ezell Surveys did not sample the appropriate universe. The culmination of these errors has yielded unreliable survey results. Accordingly, Mr. Ezell's surveys and testimony should be excluded.

## II.    Stage of the Proceeding

The Parties completed discovery on June 29. The parties have submitted proposed pretrial briefing schedules and preferred trial dates to the Court. (Doc. 77 & 79). Trial has not been set.

## III.    Issue Presented

The issue presented is whether the Court, pursuant to its role as the gatekeeper, should exclude the expert report and testimony of Defendant's expert, Matthew G. Ezell. The Fifth Circuit reviews the Court's determination of admissibility of expert evidence under *Daubert* for abuse of discretion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).

## IV.    Legal Standard: Rule 702

Expert testimony is admissible only if it is shown that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court tasked trial judges with the role of "gatekeepers" to exclude from the jury's consideration irrelevant and unreliable expert testimony. 509 U.S. 579, 597 (1993). This gatekeeper function applies to all expert testimony, not just testimony based in scientific knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

To be admissible, expert testimony must satisfy three requirements: 1) the witness must be an expert (*i.e.*, must be qualified); 2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (*i.e.*, must be reliable); and 3) the expert's testimony must assist the trier of fact (*i.e.*, must fit). *United States v. Hernandez-Acuna*, 202 F. App'x 736, 739 (5th Cir. 2006) (citing FED. R. EVID. 702); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (stating three requirements are qualifications, reliability, and fit).

An expert's opinion is reliable if it is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Daubert*, 509 U.S. at 589–90. The reliability inquiry focuses on the expert's principles and methodology, not on her conclusions. *Id.* at 595.

"The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible." *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 918 (S.D. Tex. 2007) (stating that the "proponent . . . must prove by a preponderance of the evidence that the testimony is reliable" (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Thus, Defendant bears the burden to show the Ezell Surveys and any opinions Mr. Ezell states based thereon are admissible.

## V.    Background Facts Bearing on Admissibility

### A.    Defendant did not have a CASA AZUL bottled tequila product on the market when the Ezell Surveys were conducted.

Defendant launched its CASA AZUL canned, ready-to-drink tequila soda product in July 2022. (Doc. 22-1) ¶ 17. Defendant did not launch its CASA AZUL bottled distilled tequila product until late March 2023. **Exhibit 2** (Declaration of Megan Mahle) ("Mahle Decl.") at CLASE0122356 (Tequila Raiders webpage publicly announcing launch).

The data for the Canned Products Survey was collected in two phases: (a) July 5-7, 2022 (*i.e.*, right about when Defendant launched its CASA AZUL tequila soda and approximately 9 months before Defendant launched its distilled tequila) and (b) Oct. 20-22, 2022 (*i.e.*, approximately 5 months before Defendant launched its distilled tequila). Ezell Report ¶ 14. The data for the Bottled Products Survey was collected March 11-31, 2023 (*i.e.*, just prior to Defendant's launch of its distilled tequila). *Id.* ¶ 14.[2] Accordingly, both Ezell Surveys were administered prior to Defendant launching its CASA AZUL bottled tequila product.

### B.    People mistakenly refer to Plaintiff or its CLASE AZUL tequila as "Casa Azul."

Historically, due to the visual and auditory similarity between "casa azul" and "clase azul," people have incorrectly referred to Plaintiff or its CLASE AZUL tequila product as "casa azul." For example, L.A.'s The Place Magazine published an article eleven years ago titled "Casa Azul Tequila launches La Pinta Pomegranate Tequila Liqueur" (emphasis added), which reported on the launch of one of Plaintiff's products. Mahle Decl. at CLASE0122386. In another website, www.reddit.com, a user posted a thread titled "Casa Azul tequila is now 'Clase Azul'" and commented "I've always known it as Casa Azul . . . Not sure what is going on here but I feel like I'm going crazy." *Id.* at CLASE0122381. Subsequent commenters expressed comments with the

---

[2] The Ezell Report discusses a pilot phase for the Bottled Products Survey in ¶ 14, but the pilot data was not included in the Bottled Products Survey results. Ezell Report at 19 n.13.

same sentiment. *Id.* (comments noting "Yes… I recall it as Casa Azul. You aren't going crazy" and "With you in this one").

In a Feb. 9, 2021 email to the founder of Casa Tradición, a representative from Southern Glazer's Wine and Spirits ("SGWS"), one of Plaintiff's distributors, mistakenly referred to Plaintiff or its product as "Casa Azul" in connection with a meeting regarding Plaintiff's 25th Anniversary product. **Exhibit 3** (Email to Arturo Lomeli). Other emails from SGWS or customers who contacted SGWS also show Plaintiff or its CLASE AZUL product being referred to as "casa azul." *See, e.g.*, **Exhibit 4** (email from SGWS dated Oct. 1, 2020); **Exhibit 5** (email from SGWS customer forwarded from SGWS to Plaintiff dated Dec. 2, 2020).

A non-exhaustive sampling of people referring to Plaintiff as "casa azul" is listed below:

- **Exhibit 6** at CLASE0014489 (email dated Feb. 26, 2015 confirming "we can proceed with a Casa Azul tasting" and asking if Plaintiff "would consider donating the beautiful Casa Azul Flight");
- **Exhibit 7** at CLASE0013223 (email dated Apr. 14, 2016 indicating Michael Jordan "only drinks Casa Azul");
- **Exhibit 8** at CLASE0013224 (email dated Sept. 23, 2016 quoting an article in the Phoenix New Times where the author indicates his perfect day includes "finish with a shot of Casa Azul and a Lagunitas IPA at the Playa Bar");
- **Exhibit 9** at CLASE0028082 (email dated Feb. 15, 2017 organizing event requesting 20 bottles of "Casa Azul");
- **Exhibit 10** at CLASE0003009 (email organizing customer tasting dated Mar. 1, 2019 with customer stating "I'm a huge fan and would love to have Casa Azul featured at our bar");
- **Exhibit 11** at CLASE0013487-88 (email string dated Nov. 15-16, 2019 where Plaintiff's founder corrected other party that Plaintiff's "brand name is CLASE AZUL not casa azul");
- **Exhibit 12** at CLASE018432 (email dated Apr. 22, 2021 showing Plaintiff's bottle as décor with "Casa Azul" subject line);
- **Exhibit 13**[3] at 25 sec. (TV program Real Housewives Ultimate Girls Trip (Spring 2023), reality show participants verbally refer to Plaintiff's product as "Casa Azul")

---

[3] **Exhibit 13** is a movie clip that will be provided to the Court and Defendant's counsel electronically. Plaintiff has included the slipsheet for such video with this filing as a placeholder.

Yet, despite this marketplace reality, there is no way to determine from the Ezell Surveys whether survey participants who identified "Casa Azul" were referring to Defendant, or mistakenly referring to Plaintiff.

## VI.    The *Eveready* Methodology Employed in the Ezell Surveys

The standard for trademark infringement is whether there is a likelihood of confusion between the trademarks of a senior user and a junior user. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474, 478 (5th Cir. 2008). Parties often engage experts to conduct surveys concerning likelihood of confusion. *Cf. Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 506 (5th Cir. 1980) ("Parties often introduce survey evidence in an effort to demonstrate that there is a likelihood of confusion."). There are generally two survey formats: (1) the *Squirt* format and (2) the *Eveready* format. *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464 (E.D. Va. 2017) ("There are two common methods for surveying the likelihood of confusion . . . The first is the '*Eveready*' method; the second is the '*Squirt*' method."). Here, Mr. Ezell employed the *Eveready* format.

The *Eveready* survey format is "a standard and widely accepted survey format for testing to shed light on whether confusion is likely or not." *Viacom Int'l, Inc. v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 198-99 n.108 (5th Cir. 2018) (quoting 6 THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION § 32.174 (5th ed. 2017) (hereinafter "MCCARTHY")). "Unlike the 'Squirt' format, the 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." 6 MCCARTHY § 32.174.

### A.    The origin of the *Eveready* survey format and how it works.

The *Eveready* format derives from the case *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976). The plaintiff, Union Carbide, sold "an extensive line of electric

batteries, flashlights, and miniature bulbs for automobile and marine use" under the mark EVEREADY. *Union Carbide Corp.*, 531 F.2d at 370. The defendant, Ever-Ready, Inc., sold "miniature lamp bulbs" and "high-intensity lamps" under the term "Ever-Ready." The plaintiff's expert conducted the following two likelihood of confusion surveys:[4]



```
        Lamp Survey                          Bulb Survey
Questions
    2) Who do you think puts         2) Who do you think puts
       out the lamp shown here?         out these mini-bulbs?

    3) What makes you think so?      3) What makes you think so?

    4) Please name any other        4a) Have you seen or heard of
       products put out by the           any advertising by the con-
       same concern which puts           cern which you think puts
       out the lamp shown here.          out these mini-bulbs?

                                     4b) Please specify where, what
                                          type and features you re-
                                          call.

                                      5) Please name any other
                                          products put out by the
                                          same concern which you
                                          think puts out these mini-
                                          bulbs.

    A picture of an Ever-            A blister pack of Ever-
    Ready lamp was shown             Ready bulbs was shown to
    to each person being in-         each person being inter-
    terviewed.                       viewed.

Number
Interviewed
    1009                             1014
```

*Id.* at 385. As shown above, the survey respondents were shown a picture of the defendant's product with the term "Ever-Ready" on the product or packaging associated with the product. *See id.* at 371 (discussing the defendant's product and packaging).

The district court in *Union Carbide* "found the surveys were entitled to little, if any weight." *Id.* at 386 (internal quotation omitted). The Seventh Circuit disagreed. Under the district court's analysis, "600 of the interviewees in the bulb survey (59.1%) responded 'ever ready' to

---

[4] The table from the Court's Opinion did not contain question 1, which was a screening question to remove any survey respondents involved in the bulb or lamp industries. *Union Carbide Corp.*, 531 F.2d at 385 n.11.

Question 2 'because it says so on the pack.'" *Id.* at 387. On this point, the appellate court agreed but stated:

> That the first questions alone do not show likelihood of confusion is insignificant. They only show the interviewees do not associate the Ever-Ready name with Carbide. The test, as discussed *supra*, is whether they associate the products either with Carbide *or* with the single, though anonymous, source which manufactures EVEREADY products. Those who indicated that they believed other Carbide products were manufactured by the same company that produced the bulbs or lamps shown must be considered cases of confusion.

*Id.* In other words, the probative question for confusion was whether survey respondents associated the defendant's products with the products of the plaintiff. Accordingly, the appellate court found confusion was likely and reversed the district court. *Id*. at 388.

    B. The *Eveready* format Mr. Ezell used.

The Ezell surveys employed an *Eveready* format like the *Union Carbide Corp.* case but altered the questions in a significant way that ultimately leads to unreliability. The Ezell Surveys showed survey respondents the following Defendant's products bearing the CASA AZUL mark:[5]

| **Ezell Canned Products Survey Image** | **Ezell Bottled Products Survey Image** |
|---|---|
|  |  |

---

[5] The image of Defendant's canned product or bottled products remained visible to the survey respondents throughout the survey.

{00423578.1}        8

Ezell Report at 9-10. The Ezell Surveys then asked respondents the following questions:

| | |
|---|---|
| **Q1**: | Who do you believe makes or puts out this product (or these products)?[6]<br>○    Respondent types in answer or selects "Don't know"<br>○    If "Don't know" selected, skip to Q3 |
| **Q2**: | Why do you say that?<br>○    Respondent types in answer or selects "Don't know" |
| **Q3**: | What other **_brand(s)_**, if any, are sold by whoever you believe makes or puts out this product?[7] (emphasis added)<br>○    Respondent types in answer or selects "None/Don't know"<br>○    If "None/Don't know" selected, skip to Q5 |
| **Q4**: | Why do you say that?<br>○    Respondent types in answer or selects "Don't know" |
| **Q5**: | Do you believe that whoever makes or puts out this product…? (respondents choose from the following answers)[8]<br>○    HAS the sponsorship or approval of any other company(s) or brand(s) (if this option selected, go to Q6, otherwise go to Q8)<br>○    Does NOT have the sponsorship or approval of any other company(s) or brand(s)<br>○    Don't know or no opinion |
| **Q6**: | What company(s) or brand(s)?<br>○    Respondent types in answer or selects "None/Don't know"<br>○    If "None/Don't know" selected, skip to Q8 |
| **Q7**: | Why do you say that?<br>○    Respondent types in answer or selects "Don't know" |
| **Q8**: | Do you believe that whoever makes or puts out this product…? (respondents choose from the following answers)[9]<br>○    HAS a business affiliation or business connection with any other company(s) or brand(s) (if this option selected, go to Q9, otherwise skip to end)<br>○    Does NOT have a business affiliation or business connection with any other company(s) or brand(s) |

---

[6] The word "product" was singular in the Canned Products Survey and plural in the Bottled Products Survey. Screenshots of exactly what survey respondents saw on the screen during the Ezell Surveys are attached to the Ezell Report as appendices. *See* **Exhibit 14** at 101-14 (screenshots from Ezell Canned Products Survey) & **Exhibit 15** at 189-204 (screenshots from Ezell Bottled Products Survey) (citation to page numbers stated at bottom of Exhibits**)**.
[7] *Id.*
[8] The order of first two choices was rotated between respondents.
[9] The order of first two choices was rotated between respondents.

| | | o    Don't know or no opinion |
|---|---|---|
| **Q9**: | | With what company(s) or brand(s)? |
| | | o    Respondent types in answer or selects "None/Don't know" |
| | | o    If "None/Don't know" selected, skip to end |
| **Q10**: | | Why do you say that? |
| | | o    Respondent types in answer or selects "Don't know" |
| **End** | | Thank you for your time and participation. |

As noted in question Q3 above, the Ezell Surveys appreciably altered the *Eveready* format given in the *Union Carbide Corp.* case by using the word "brand(s)" instead of "products," and repeated the word "brand(s)" in questions Q5, Q6, Q8, and Q9. As discussed below, this alteration significantly undermines any purported reliability of the Ezell Surveys.

Procedurally, a third-party data company administered the surveys, collected respondents' responses, and reported the survey data to Mr. Ezell. **Exhibit 16**, (Deposition of Matthew Ezell dated June 9, 2023) ("Ezell Depo.") at 82:21 – 83:11. Once the data was reported, Mr. Ezell reviewed the respondents' responses and coded them into certain categories. Ezell Depo at 17:7 – 18:23; 20:24 – 21:2. Mr. Ezell chose categories based on his review of the data, creating what he "felt would be helpful categories" Ezell Depo at 123:11 – 124:17. The Ezell Report presents these categories in four tables that group related questions together, and in one final table with the results as a whole.[10] Two categories were "Clase Azul" and "Casa Azul" and, though seemingly uncontroversial, these two categories failed to account for marketplace realities.

**VII.    Arguments and Authorities**

"Serious flaws in a survey will make any reliance on that survey unreasonable." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (citing *Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 789 (5th Cir. 1984)). In other words, "a survey can be

---

[10] *See* Ezell Report at 13-17 (Canned Products Survey results) & 19-23 (Bottled Products Survey).

so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Id.* (internal quotation omitted). The Ezell Surveys are "so badly flawed" they are not reliable.

      A.  <u>For *Eveready* to be an effective survey methodology, the survey participants must be aware of the senior user's brand and able to identify the brand from memory.</u>

"Because the Eveready survey does not expose respondents to the senior mark, confusion can be evidenced only if respondents, on their own, name the senior user, identify its products or services, or give other answers sufficient to make reasonably certain that they are thinking of the senior user when exposed to the allegedly infringing use." Hal Poret, *An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks That Are Not Top of Mind*, 109 THE TRADEMARK REPORTER 935, 937 (2019) ("Poret Article"), attached hereto as **<u>Exhibit 17</u>**. In other words, "respondents can identify the senior user during an Eveready survey only if they are already aware of the senior mark prior to the survey, such that a memory of the senior mark can be accessed when triggered by the survey showing respondents a confusingly similar use." *Id.* at 938. Thus, to reliably measure confusion, survey respondents for the Ezell Surveys must have been exposed to Plaintiff's CLASE AZUL mark prior to the survey.

Mr. Ezell admitted his surveys do not test whether participants have been exposed to CLASE AZUL and participants may, or may not, have been previously exposed:

> Q: Mr. [Ezell], is there a way to tell from the data you collected in the canned products survey whether each respondent taking the survey had been exposed to Plaintiff's Casa [sic, "Clase"][11] Azul Tequila product prior to taking the survey?
>
> A. Your question is there a way to know that?
>
> Q. Yes.
>
> A. No. There's not a way to tell from the survey data. Respondents may or may not have been exposed to the Clase

---

[11] Mr. Ezell corrected this error in his errata sheet.

Azul brand prior to taking the survey. And if they were not aware of the Clase Azul brand, then that marketplace reality would be reflected in the results. And if they were aware of the Clase Azul brand, then they would have been given four opportunities to mention Clase Azul in response to the confusion questions.

Q. And I have the same question that I just asked for the bottled products survey. Is there a way to tell from the data you collected in the bottled products survey whether each respondent taking the survey had been exposed to Plaintiff's Clase Azul Tequila product prior to the taking the survey? Is your answer the same for that question?

A. Yes.

Ezell Depo. at 198:9 – 199:7. Consequently, there is no record of whether respondents had prior exposure to CLASE AZUL, which is necessary for an *Eveready* to effectively measure confusion.

**B. Mr. Ezell admits the Ezell Survey participants may have failed to identify CLASE AZUL because the participants were unfamiliar with CLASE AZUL.**

As explained above, it is critical for participants in an *Eveready* survey to have prior knowledge of the senior user's product. Without such knowledge, participants cannot identify the senior user in response to the survey questions which causes the survey results to improperly skew towards no likelihood of confusion.

Mr. Ezell admitted survey participants may have failed to identify CLASE AZUL in response to the survey questions because the participants were unfamiliar with CLASE AZUL, and there is no way to tell from his data why the participant failed to identify CLASE AZUL:

A. … And if they don't think of Clase Azul, it could be because they either are not familiar with Clase Azul, or simply because Casa Azul and Clase Azul are not sufficiently similar to cause a mental connection with – for that respondent.
….

A. I would agree that there may be two reasons, two different reasons, as to why someone may not exhibit confusion. But at the end of the day, I'm not concerned with whether it's reason

"A" or "B," because if someone is not aware of Clase Azul
prior to taking the survey, then that means they're not aware of
Clase Azul in the marketplace.

Ezell Depo. at 53:4-8 & 19-25. Thus, there is no way to determine whether any survey

respondents were aware of Plaintiff's CLASE AZUL mark or Plaintiff's CLASE AZUL tequila

product, and Mr. Ezell was not concerned whether the survey respondents had previously been

exposed, because such exposure (or lack thereof) is a "marketplace reality." Mr. Ezell's *Eveready*

methodology is flawed because there is no way to systematically determine whether the

respondents were familiar with Plaintiff's CLASE AZUL product.

C.  The Ezell Surveys did not account for the marketplace reality that many consumers
mistakenly refer to Plaintiff's CLASE AZUL tequila as "casa azul."

Mr. Ezell coded all survey responses stating "Casa Azul" as referring to Defendant or its

product and, therefore, not showing confusion. In Mr. Ezell's words, "If somebody says 'Casa

Azul' in their response, I put them in the 'Casa Azul' category." Ezell Depo. at 142:11-13.

However, many consumers incorrectly think the name of Plaintiff's CLASE AZUL tequila is

"Casa Azul." Under this marketplace reality, a respondent indicating "Casa Azul" in response to

survey questions may have been referring to Plaintiff or Plaintiff's tequila product and, therefore,

confused into believing Defendant's CASA AZUL product was affiliated with Plaintiff.

Several examples from the Ezell Report data appendices clearly demonstrate the survey

participant incorrectly thought Plaintiff's brand was "Casa Azul" while taking the Ezell Surveys.

Yet, Mr. Ezell coded these responses—which were a clear reference to Plaintiff or its CLASE

AZUL tequila—as a reference to Defendant instead of Plaintiff.[12]

1.  Demonstrated examples from the Canned Products Survey where respondents
referred to Plaintiff as "Casa Azul."

---

[12] The discussion of these examples refers to a "RESPID" number, which was a unique number Mr. Ezell assigned
to each respondent throughout the data tables. Ezell Depo. at 126:17 – 127:6.

The Canned Products Survey contains several instances of respondents referring to "Casa Azul" tequila even though Defendant did not have a distilled tequila spirits product on the market at the time the respondent took the survey.

**Example 1**: In response to question Q1 (*i.e.*, asking who makes or puts out Defendant's tequila product), RESPID 1043 stated "Casa Azul," and for question Q2 (*i.e.*, asking "Why do you say that") RESPID 1043 responded "Name is on the can and I know they make tequila." **Exhibit 14** at 10. However, RESPID 1043 could not "know" Defendant made tequila at the time because Defendant did not launch its tequila until months later. Nevertheless, Mr. Ezell coded this response as referring to Defendant's product, and stood by his decision to do so. Ezell Depo. at 128:25 - 130:4.[13]

**Example 2**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's tequila product), RESPID 2019 stated "Casa Azul tequila," and for Q2 (*i.e.*, asking "Why do you say that") RESPID 2019 answered "It has the biggest writing." **Exhibit 14** at 11. However, RESPID 2019 could not have been referring to Defendant or its tequila because Defendant did not launch its tequila until months later. When asked whether this response referred to Defendant despite Defendant not offering a tequila at the time RESPID 2019 answered, Mr. Ezell stated "I can't say for certain what a particular respondent has in their mind. I can only read what they typed out for me. And someone who typed in 'Casa Azul, to me, that sounds like 'Casa Azul.'" Ezell Depo. at 132:11-24.

**Example 3**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's tequila product), RESPID 1060 stated "Casa Azul," and for Q2 (*i.e.*, asking "Why do you say that") RESPID 1060 answered "Printed on the can and box." **Exhibit 14** at 11. Mr. Ezell categorized

---

[13] In each data table, one can see the category where Mr. Ezell coded the data at the top of the table, under the respective questions the data pertains to. In this case, "Category 3: Casa Azul" is stated at the top. **Exhibit 14** at 10.

these responses to Q1 and Q2 as "Category 3: Casa Azul" meaning the response was counted as a reference to Defendant. **Exhibit 14** at 11 (top of page). Then, for Q3 (*i.e.*, asking what other brand(s), if any, are sold by whoever makes or puts out Defendant's tequila product), RESPID 1060 said "Tequila," and in response to Q4 (*i.e.*, asking "Why do you say that") RESPID 1060 says "I've seen their tequila." **Exhibit 14** at 45. Mr. Ezell categorized these responses to Q3 and Q4 as "Category 5: Other responses" meaning the response was not counted as a reference to Plaintiff. **Exhibit 14** at 45 (top of page).  However, RESPID 1060 clearly had seen "Casa Azul's" tequila when one considers the answers to Q1 and Q4, yet this respondent's answers were <u>not</u> counted as a reference to Plaintiff or its CLASE AZUL tequila. When Plaintiff pointed out this fact to Mr. Ezell in deposition, he testified the discrepancy could be due to "any number of explanations," that RESPID 1060 "could have misremembered," and even that "it's certainly possible" RESPID 1060 could have been referring to Plaintiff's CLASE AZUL tequila. Ezell Depo. at 135:4 – 136:19.

**Example 4**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's tequila product), RESPID 2060 stated "Casa Azul," and for Q2 (*i.e.*, asking "Why do you say that") RESPID 2060 answered "The Label on the box and can." **Exhibit 14** at 14. Mr. Ezell categorized these responses to Q1 and Q2 as "Category 3: Casa Azul" meaning the response was counted as a reference to Defendant. **Exhibit 14** at 14 (top of page). Then, for Q3 (*i.e.*, asking what other brand(s), if any, are sold by whoever makes or puts out Defendant's tequila product), RESPID 2060 responded "Casa Azul tequila," and for Q4 (*i.e.*, asking "Why do you say that") RESPID 2060 answered "The label and I drink Casa Azul tequila." **Exhibit 14** at 37. Mr. Ezell categorized these responses to Q3 and Q4 as "Category 3: Casa Azul" meaning the response was counted as a reference to Defendant. **Exhibit 14** at 45 (top of page).  However, Defendant did

not sell a distilled tequila spirit at the time RESPID 2060 took the survey, so there is no way RESPID 2060 could drink Defendant's tequila.

**Example 5**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's tequila product), RESPID 2150 stated "Casa Azul tequila brand" and for Q2 (*i.e.*, asking "Why do you say that") RESPID 2150 answers "Clearly listed in the box and Casa Azul sounds like a familiar tequila brand." **Exhibit 14** at 16. However, RESPID 2150 could not have been familiar with Defendant's tequila brand because Defendant did not sell a distilled tequila spirit at the time RESPID 2150 took the survey. Yet, once again, Mr. Ezell coded this response as a reference to Defendant. **Exhibit 14** at 16 (top of page).

> 2. Demonstrated examples from the Bottled Products Survey where respondents referred to Plaintiff as "Casa Azul."

The Bottled Products Survey contains several instances where respondents identified "Casa Azul" as the producer of Defendant's bottled tequila but indicated they had seen the bottle in a different form. However, Defendant had not yet launched its distilled tequila spirit.

**Example 1**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's bottled tequila product), RESPID 1023 stated "Casa Azul sold by specs and more liquor stores" and for Q2 (*i.e.*, asking "Why do you say that") RESPID 1023 answered "I've seen this brand different packaging before." **Exhibit 15** at 11. Mr. Ezell categorized these responses to Q1 and Q2 as "Category 3: Casa Azul" meaning the response was counted as a reference to Defendant. **Exhibit 15** at 11 (top of page). However, Defendant's bottled tequila product could not have been in different packaging before because it had not even been offered for sale at the time RESPID 1023 took the survey. When asked about whether this respondent could have been remembering Plaintiff's brand and different packaging, Mr. Ezell testified "[t]hat is a possibility" and "perhaps it should be under an 'Other' category for another brand." Ezell Depo. at 181:8 - 182:7.

**Example 2**: In response to Q1 (*i.e.*, asking who makes or puts out Defendant's bottled tequila product), RESPID 1235 stated "Casa Azul, but it is a bottle different than I've seen" and for Q2 (*i.e.*, asking "Why do you say that") RESPID 1235 states: "I see the brand name. But I've only seen it in a more decorative bottle." **Exhibit 15** at 20. Yet again, Mr. Ezell categorized these responses to Q1 and Q2 as "Category 3: Casa Azul" meaning they were counted as a reference to Defendant. **Exhibit 15** at 20 (top of page). However, Defendant's bottled tequila product could not have been "in a more decorative bottle" when this respondent previously saw "the brand name" because Defendant's bottled tequila had not even been offered for sale at the time RESPID 1235 took the survey. When asked about whether this respondent could have been remembering Plaintiff's brand and different packaging, Mr. Ezell testified "[i]t's a possibility that it's just as likely that someone is thinking of another brand tequila, Cazul or Casa azul[14] or Casamigos. So I just don't know." Ezell Depo. at 183:12-21. Yet, Mr. Ezell categorized this response as a reference to Defendant's bottled tequila product.

**Example 3**: In response to Q5 (*i.e.*, asking whether whoever makes or puts out Defendant's bottled tequila product has the sponsorship or approval of any other company(s) or brand(s)), RESPID 1281 selected the choice indicating whoever makes or puts out Defendant's bottled tequila product "HAS the sponsorship or approval" of another company or brand. *See* Ezell Depo. at 193:4 – 194:1 (explaining all respondents reported on the Q5-Q7 tables answered the Q5 questions in the affirmative). Then, in response to Q6 (*i.e.*, "What company(s) or brand(s)"), RESPID 1281 states "Casa Azul," and for Q7 (*i.e.*, "Why do you say that") states "I believe I have had this brand of tequila, but in a different bottle and it was not organic." **Exhibit 15** at 67. Mr. Ezell categorized these responses to Q5-Q7 as "Category 3: Casa Azul" meaning they were counted as a reference to Defendant. *Id.* (top of page). However, RESPID 1281 could

---

[14] Mr. Ezell corrected this to "Casazul" in his errata sheet.

not have had Defendant's bottled tequila "in a different bottle" because Defendant's bottled

tequila had not even been offered for sale at the time this respondent took the survey. When

asked whether he could rule out the possibility that RESPID 1281 was referring to Plaintiff's

CLASE AZUL tequila, Mr. Ezell testified "I can neither confirm nor deny that they were

thinking of, hypothetically speaking, Clase Azul. I just don't know. It's just as likely they're

thinking of another different brand."  Ezell Depo. at 196:5-12. Yet, Mr. Ezell categorized this

response as a reference to Defendant's bottled tequila product despite not knowing whether

RESPID 1281 was referring to Plaintiff's CLASE AZUL brand.

    3.  <u>The implication of the above examples.</u>

The above examples demonstrate respondents were thinking of Plaintiff's CLASE AZUL

tequila when they answered "Casa Azul" in connection with Defendant's product, yet the Ezell

Surveys coded these responses as referring to Defendant, and, therefore, not showing confusion.

This fact, alone, makes the Ezell Survey unreliable because the responses were not properly

coded. Accordingly, the percentages Mr. Ezell presents in his report to conclude no likelihood of

confusion are not accurate percentages, which calls into question his conclusion.

Defendant may argue even if the above identified examples were coded as a reference to

Plaintiff, Mr. Ezell's conclusions still would not be affected. However, the problem is not just the

identified examples. The problem is the Ezell Survey design is incapable of distinguishing those

respondents who answered "casa azul" as a reference to Plaintiff (*i.e.*, because the respondent did

not accurately remember or know Plaintiff's brand name) from those participants who answered

"casa azul" as a reference to Defendant. Most of the Ezell Survey responses do not include

enough information to make such a determination. However, survey answers stating "Casa Azul"

and coded to as a reference to Defendant may, in reality, be a reference to Plaintiff.

Mr. Ezell claimed survey respondents did not need to know the correct name of Plaintiff's CLASE AZUL brand to be counted as a reference to Plaintiff. When asked whether it was possible Canned Products Survey respondents who referred to "Casa Azul" as a tequila brand— *i.e.*, before Defendant sold a tequila—were remembering Plaintiff's CLASE AZUL tequila brand but didn't accurately remember the name of Plaintiff's tequila, Mr. Ezell testified: "Hypothetically that's possible, and it's just as possible someone is thinking of 'Casamigos' or 'Cazul' or some other brand of tequila. I just don't know. And because they said 'Casa Azul' I coded them in the category 'Casa Azul.'" Ezell Depo. at 145:9-20. When asked whether the respondents who took the Ezell Surveys confused Plaintiff's CLASE AZUL when responding "Casa Azul" to a question, Mr. Ezell testified:

> Anything is possible. However, I don't necessarily believe that that is likely. I can only look at what a respondent said. And if they didn't say 'Clase Azul' or describe in meaningful detail some characteristic of Clase Azul, such as Arturo Lomeli,[15] you know, a name being mentioned or the unique ceramic bottle that it comes in, I just can't speculate as to what a respondent was thinking, other than what they said.

Ezell Depo. at 228:21 – 229:7.

However, none of the questions in the Ezell Surveys asked respondents to describe characteristics of products or name people associated with products. Rather, the survey respondents were asked about other "company(s)" or "brand(s)" that may be associated with the picture of Defendant's products shown on the screen, and they were specifically instructed "Please do not guess." **Exhibit 14** at 104; **Exhibit 15** at 193. As such, there was no reason for respondents to describe characteristics of products or name people associated with products and, indeed, respondents were instructed not to guess information such as a product description or personal name that was not asked for in the question.

---

[15] Mr. Lomeli is the founder of Plaintiff.

D.  The Ezell Surveys did not ask the "products" question.

The Ezell Surveys did not follow the *Eveready* protocol set out in the *Union Carbide Corp.* case. Specifically, the surveys did not ask survey respondents to name any other ***products*** put out by the same concern which the respondents thought put out Defendant's products displayed on the screen. Instead, in question Q3 the Ezell Surveys asked respondents to name "What other ***brand(s)***, if any, are sold by whoever you believe makes or puts out" Defendant's displayed products (emphasis added). This alteration is significant because for a respondent to name another brand the respondent must be willing to accept there is/are ***other*** brand(s) **different than** what the respondent named in response to question Q1 (*i.e.*, where the respondent was asked to name who makes or puts out Defendant's displayed product). If a respondent had already named "Casa Azul" in response to question Q1 and such response was an incorrect reference to Plaintiff's CLASE AZUL brand, the respondent would have no reason to name another brand in response to question Q3.

The *Union Carbide Corp.* case recognized the problem of relying on respondents using brand names, alone, to measure confusion. The Seventh Circuit indicated those who responded, "ever ready" (*i.e.*, the brand name), in response to the question about who puts out the displayed product was "insignificant." *Union Carbide Corp.*, 531 F.2d at 387. However, what was significant, and what the trial court had erroneously failed to consider, was the number of respondents who associated Union Carbide's other products with the defendant's displayed products. *Id*. Here, the Ezell Surveys did not ask such a question and, thus, this significant indicator of confusion cannot be measured.

E.  The Ezell Surveys did not allow respondents to explain why they did not know answers to the questions.

Adding to the inherent unreliability of the Ezell Surveys is the fact that survey respondents were not given an opportunity to state why they answered a question "Don't know," which could have given insight into confusion. Respondents who clicked the box for "Don't know" were not given the opportunity to explain why they selected that option. However, survey respondents who had previously encountered Plaintiff's brand in Plaintiff's distinctive bottles and either could not accurately remember the CLASE AZUL name or incorrectly thought the name was "Casa Azul," may have selected "Don't know" because they were seeing a product on the screen that looked different. These respondents may have indicated "I have seen this product in a different bottle," or something to that effect, had they been given an opportunity to explain their "Don't know" answer.

Survey respondents may also have selected "Don't know" because they accurately remembered Plaintiff's CLASE AZUL brand of tequila but saw a tequila product with "Casa Azul" on it. Such survey respondents would be confused but not able to explain their confusion.

F.   Mr. Ezell did not consider product proximity when selecting his survey design.

Mr. Ezell did not properly consider whether Plaintiff's tequila products and Defendant's tequila products are proximate in the marketplace when he selected the *Eveready* methodology. The following exchange from Mr. Ezell's deposition speaks to the issue:

> Q. When you were formulating your survey design for Defendant's tequila soda, the canned products survey, did you consider whether Defendant's tequila soda product and Plaintiff's Clase Azul Tequila Spirit products were proximate?
>
> A. No; nor did I need to. This was an Eveready survey focusing on prospective purchasers of Defendant's category of products, so there's no need to understand whether the marks, whether the senior or junior users, are proximate in the marketplace.
>
> Q. Same question for the bottled products. When you were formulating your survey design for Defendant's bottled tequila, did you consider whether Defendant's bottled tequila and Plaintiff's Clase Azul tequila were proximate?

A. The same response as before.

Ezell Depo. at 201:9-24. In other words, Mr. Ezell saw no need to consider whether Plaintiff's and Defendant's products were proximate because he chose to employ an *Eveready* survey.

However, commentators recognize *Eveready* surveys can fail to detect confusion if respondents are not aware of the senior user's mark, but the products are proximate in the marketplace. Poret Article at 939-40 (indicating "where the parties' marks are used in close enough proximity that consumers will encounter both with appreciable frequency . . . . lack of consumer awareness of the senior mark could cause an Eveready survey to fail to detect confusion, even though the actual marketplace conditions may render confusion likely."). The argument is premised upon the fact that the *Eveready* methodology exposes survey respondents to only the junior user's mark, while in the marketplace both marks would be encountered. *Id.* ("By presenting *only* the junior mark, the survey would fail to take account of the fact that consumers are reasonably likely to encounter the senior mark (and thus gain awareness of it) while shopping for and encountering the product bearing junior mark.").

In the present case, the parties' products are tequila products and are proximate. Consumers are likely to encounter both marks in the marketplace. However, the *Eveready* methodology the Ezell Surveys employed fails to account for this marketplace reality.

G. <u>The Ezell Canned Products Survey sampled the wrong universe.</u>

Moreover, despite the parties' products being proximate and the awareness of Plaintiff's mark such proximity creates, Mr. Ezell also selected a survey universe for his Canned Products Survey that ensures many respondents would not be aware of Plaintiff's tequila brand.

"Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 6 MCCARTHY § 32.159. Defining the relevant universe is critical "because there may be systemic

differences in the responses of members of the population and nonmembers." FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 377 (3d ed. 2011) In a survey testing forward confusion, such as the present case, "[t]he appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).

The Ezell Canned Products Survey does not include a "fair sampling" of those purchasers most likely to partake in Defendant's tequila soda. More specifically, the Ezell Canned Products survey did not limit survey respondents to those individuals who were likely to purchase a canned tequila soda product, instead opting for an overinclusive sample of those likely to purchase a "Ready-to-drink canned cocktails" in general. Specifically, screening question S4 required respondents to select that they intended to purchase a "Ready-to-drink canned cocktail" to complete the survey. *See* **Exhibit 14** at 2 (showing survey programming instruction).

The problem with such an overinclusive sample is the wide variety of ready-to-drink canned cocktails in the market which contain alcohol or distilled spirits other than tequila. *See, e.g.*, Exhibit I to Am. Complaint (Doc. 57-1) at 36 (showing examples of canned ready-to-drink cocktails from spirits manufacturers who do not manufacture distilled tequila spirits). When asked in deposition about his survey sample, Mr. Ezell testified he did not need to narrow the universe because ready-to-drink canned cocktails "typically are sold in the same section of stores" or under the same products category on websites. Ezell Depo. at 94:10 - 95:14. However, the proper universe is not prospective purchasers of products "in the same section of stores" or products in the same category, it is prospective purchasers of the allegedly infringing product.

"Respondents who are not potential consumers may well be less likely to be aware of and to make relevant distinctions" in the context of trademark infringement surveys. *Weight Watchers*

*Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (expressing "strong misgivings" where the plaintiff's survey sampled those who had purchased frozen food entrees instead of universe directed to "consumers who had purchased a *diet* frozen entree"). Prospective consumers of canned ready-to-drink cocktails derived from a multitude of distilled spirits are less likely to be aware of, and make relevant distinctions, concerning Defendant's tequila soda and/or the tequila in general. For example, consumers who drink bourbon-based or rum-based ready-to-drink cocktails may know nothing about tequila soda and/or tequila brands.

This methodical flaw is enough to severely undercut any probative value of the Canned Products Survey and may warrant exclusion on its own. *See, e.g.*, *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504 (6th Cir. 2007) (finding persuasiveness of survey undermined because universe of those likely to purchase a bottle of wine in the $5 to $14 price range did not reflect "only those people who would purchase moderately priced wines produced in the state of Michigan" nor was it limited to "wine purchasers who acquire wine through wine tasting rooms, the primary distribution source of [the defendant]"); *Rimowa Distrib. v. Travelers Club Luggage, Inc.*, 217 F. Supp. 3d 400, 410 (D. Mass. 2016) (refusing to accord any definitive weight to survey where sample of survey respondent was prospective purchasers of luggage in the aggregate and not limited to hard-side suitcases); *Big Dog Motorcycles. L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1333-34 (D. Kan. 2005) (finding proponent's survey provided "essentially no probative value" because its "universe broadly included prospective purchasers of all t-shirts and caps" rather than the proper universe of buyers who would likely purchase such goods "at motorcycle dealerships"); *Lon Tai Shing Co. v. Koch+Lowy*, 21 U.S.P.Q.2d 1858, (S.D.N.Y. 1992) (finding probative value of alleged infringer's survey "minimal" because survey sampled those who purchased or intended to purchase any table or

desk lamp instead of the halogen lamps at issue); *cf. Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.*, 121 U.S.P.Q.2d 1477, 1493-94 (T.T.A.B. 2017) (finding trademark opposer's survey "not meaningful" in genericness case concerning term "Tequila" because survey sampled "purchasers of hard liquor rather than purchasers of Tequila" for its universe of respondents").

However, Mr. Ezell's wrong universe also creates a scenario where respondents who know nothing about tequila—and therefore are less likely to be aware of Plaintiff's tequila brand—answered questions about other brands they would know nothing about. Asking these respondents to identify other "brand(s)" or "company(s)" associated with Defendant's tequila when they know nothing about tequila, depresses the confusion rate that could have occurred had the proper universe—*i.e.*, prospective purchasers of Defendant's ***tequila*** soda—been selected.

## VIII.   CONCLUSION

The Ezell Surveys were designed in such a way where it is impossible to know whether the survey respondents were referring to Plaintiff (or some other brand) when they answered "Casa Azul." As such, the Ezell Surveys are simply not grounded in science and therefore, are not reliable.

### CERTIFICATE OF CONFERENCE

The undersigned hereby certifies counsel for Plaintiff conferred with counsel for Defendant via Zoom regarding Plaintiff's Motion to exclude the testimony of Matthew G. Ezell. Defendant opposes the relief sought in Plaintiff's motion.

/s/Edward B. Marvin

### PRAYER

WHEREFORE, Plaintiff prays for an Order excluding the expert report of Matthew G. Ezell and excluding Mr. Ezell from testifying at trial concerning his report and the Ezell Surveys.

Date: August 18, 2023                          Respectfully submitted,

                                               By:/s/*Miguel Villareal, Jr.*
                                               Miguel Villarreal, Jr.
                                               Attorney-in-Charge
                                                    Texas State Bar No. 24042095
                                                    S.D. Texas Attorney No. 566669
                                                    Miguel.Villarreal@gunn-lee.com
                                               Brandon T. Cook
                                                    Texas State Bar No. 24084166
                                                    S.D. Texas Attorney No. 3312656
                                                    bcook@gunn-lee.com
                                               Edward B. Marvin
                                                    Texas State Bar No. 24055917
                                                    S.D. Texas Attorney No. 777369
                                                    emarvin@gunn-lee.com
                                               Julie P. Bell
                                                    Texas State Bar No. 24116091
                                                    S.D. Texas Attorney No. 3778079
                                                    julie.bell@gunn-lee.com
                                               GUNN, LEE & CAVE, P.C.
                                               8023 Vantage Dr., Suite 1500
                                               San Antonio, Texas 78230
                                               210-886-9500
                                               210-886-9883 Facsimile

                                               **ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

        I hereby certify that on August 18, 2023, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

                                               */s/ Miguel Villarreal, Jr.*
                                               Miguel Villarreal, Jr.