United States District Court
Southern District of Texas

**ENTERED**

April 15, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| CASA TRADICION, S.A. de C.V., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-22-2972 |
| | § | |
| CASA AZUL SPIRITS, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM AND ORDER**

This is a trademark dispute between two brands of tequila. One brand is "CLASE AZUL." The second is "CASA AZUL." The maker and distributor of CLASE AZUL, Casa Tradición S.A. de C.V. ("the plaintiff"), sued the maker and distributor of CASA AZUL, Casa Azul Spirits, LLC ("the defendant"), claiming a likelihood of confusion and seeking a permanent injunction against the defendant's use of the trademarked name, "CASA AZUL."

After a bench trial and review of a voluminous record of deposition testimony and documents, the court finds and concludes that both companies can continue to market their tequila products. Although both parties sell bottled tequila, the products marketed under each brand are different, the trade dress for each brand is different, the trade names mean different things, and the consumer markets they target are different. There are many tequila brands sold in the United States. Some of the most successful sellers are Jose Cuervo, Patron, Don Julio, Casamigos, and Casa Noble.  Many of these tequila brands—over fifty—have the words "Casa" or "Azul" in the name. Neither of the parties' tequilas rank as near the most popular or well-known tequilas sold in the United States.  But both have done very well. The plaintiff's total sales in the past three years were

$205 million, $280 million, and $250 million, respectively. (Docket Entry No. 178 at 201:13-16; 251:3-4). Importantly, the record shows no evidence that Clase Azul's sales declined as a result of Casa Azul entering the tequila market. (*See, e.g.*, Docket Entry Nos. 136 at 16, 178 at 251:12-17).

The court finds and concludes that because of the dissimilarities between the two brands at issue, as well as other record evidence, the plaintiff fails to establish a likelihood of confusion, and fails to establish trademark infringement, unfair competition, or trademark dilution. The application for an injunction is denied.

The findings and conclusions leading to this result are set out below.

**FINDINGS OF FACT**

## I.    The Parties

The plaintiff, Casa Tradición S.A. de C.V. is a Sociedad Anóma de Capital Variable formed under the laws of Mexico. (Docket Entry No. 1). The defendant, Casa Azul Spirits, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in California. (*Id.*).

The plaintiff's founder, Arturo Lomeli, began marketing the CLASE AZUL brand of tequila approximately 25 years ago, as a small family-owned operation in Jalisco, Mexico. The company has grown, but it is still family owned. It began selling its tequila in the United States in February 2003. In March 2008, the United States Patent and Trademark Office registered the "CLASE AZUL" mark as Registration No. 3,403,628, for use in connection with distilled tequila. The mark is incontestable. The plaintiff sells distilled tequila and some luxury lifestyle products, but it does not sell any canned soda products.

The defendant's founder, Lance Collins, is an entrepreneur in the beverage industry in the United States. He created successful non-alcoholic beverage brands and sold wine for many years

before selling tequila products. In April 2006, before the plaintiff filed its U.S. trademark application for "CLASE AZUL," the defendant's founder and his father filed with the Patent Office an application to register "CASA AZULE" for use in connection with wine. U.S. Ser. No. 78/868,214.

In May 2006, the application was amended to change the trade name to "CASA AZUL." In November 2006, the Patent Office published the application, which the plaintiff did not oppose. In May 2008, the Patent Office registered the "CASA AZUL" trademark as U.S. Reg. No. 3,424,540. It is incontestable. In June 2018, Collins applied to register the CASA AZUL trademark to include alcoholic beverages other than beer. The plaintiffs did not oppose the application when it was published, and the trademark was registered in November 2019. U.S. Reg. No. 5,921,855.

## II.     The Defendant's Tequila Soda

In March 2021, Collins formed Casa Azul Spirits, Inc., and assigned the "CASA AZUL" trademark for wine and alcoholic beverages to that company. Its first product was a ready-to-drink canned fruit-flavored tequila soda. The United States Alcohol and Tobacco Tax and Trade Bureau granted the applications for label approval, which were filed on the public record.

The defendant's canned tequila soda retailed for a few dollars per can and was sold in 12-ounce cans featuring images of different fruits representative of the soda flavor. (Docket Entry No. 186-2 at DX-045). The cans display the CASA AZUL logo of a small house with a pointed roof and the words "CASA AZUL" printed inside the image of the house. (Docket Entry No. 179 at 163:3-12). The soda is generally sold in single-flavored four packs or multi-flavored eight packs. (Docket Entry Nos. 186-2 at DX-045 at 15, 186-9 at DX-108). In retail stores, the defendant's canned tequila sodas are normally sold next to other brands of ready-to-drink cocktails, such as High Noon, Truly, White Claw, and Onda. (Docket Entry Nos. 186-2 at DX-045 at 14, 186-3 at

3

DX-059 at 16, 179 at 180:19-181:6, 181:17-25). In 2023, the defendant sold 1.5 million cans of Casa Azul canned tequila soda. (Docket Entry No. 179 at 179:25-180:8).

None of the plaintiff's tequilas is a canned product or a soda product. The plaintiff's tequilas are distilled liquor sold in either distinctive glass bottles or even more distinctive blue and white hand-painted artisan ceramic containers. The plaintiff's tequilas are much more expensive than the defendant's tequila or tequila soda. The plaintiff's tequilas are sold in different parts of retail stores than the defendant's canned tequila sodas.

It is not reasonable to believe, and the evidence does not show a likelihood that, a consumer would confuse the defendant's inexpensive canned tequila fruit-flavored soda with the plaintiff's much more expensive and different bottled distilled premium tequila. Nor is it reasonable to find, and the evidence does not show a likelihood that, a consumer would believe that the defendant's tequila soda is made by or affiliated with the plaintiff's tequila. The nature of the defendant's canned tequila soda compared to the plaintiff's distilled premium tequila; the different trade dress; the gap between the defendant's low-priced soda and the plaintiff's expensive premium tequilas; and the different ways the two types of products are marketed all defeat a finding that there is a likelihood of consumer confusion.

First, the defendant markets its tequila soda to a younger consumer who wants an inexpensive, organic fruit drink that is only lightly alcoholic and meant to be consumed in very casual social settings, such as poolside gatherings or barbecues. (Docket Entry No. 179 at 186:16-20). By contrast, the plaintiff primarily markets its much more expensive distilled bottled tequilas as part of a sophisticated lifestyle enjoyed by individuals of means who appreciate quality and are willing to pay for it. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221 (5th Cir. 2009) (whether marketing is similar hinges not on if the products are the same but whether the marketing

4

"target[s] the same class of buyers."). The plaintiff did introduce one piece of evidence that appears to be aimed at a young and "hip" audience. This was a video of younger individuals dancing to modern music, with the words "CLASE AZUL" spoken amid references to sex and marijuana use, but with no depiction of the distinctive CLASE AZUL tequila bottles.[1] The plaintiff did not pay the artist to reference their product in the video, and did not introduce evidence that it was involved in the production of the video. The plaintiff also introduced no evidence that this video marketed the plaintiff's product to a younger audience.

Second, the defendant markets its canned tequila sodas as an organic and low-calorie lightly alcoholic product; the plaintiff markets its bottled tequila as a premium product that will satisfy a discerning consumer.

Third, the defendant's trade dress and advertising of its tequila soda are highly distinctive. The bright teal blue color of the individual cans and cardboard box packaging for a four pack stand out. The distinctive color is repeated in the logo shown below, which has the outline of a house with a peaked roof and the words CASA AZUL inside the house, with a small house with a peaked roof in the same distinctive blue color inside the larger outlined house. The design tracks the name of the product—CASA AZUL, a blue house. The design and name are repeated in the advertising slogans the defendant uses for its soda products: "mi casa es su casa"; "one sip and you're home";

---

[1] Below is one example of a reference to "CLASE AZUL," in translation:

> And Clase Azul, the tequila, class shows
> The bells ring and the shots go to your mouth
> And there's Ru-, she's single, she's really hot
> Come, pass me the smoke with your mouth

(Docket Entry No. 187-15 at PX-228).

"feel at home, wherever you go"; "an open door"; and "let's be real," a reference to the use of real tequila in the soda products. The reference to a house is repeated in the defendant's hashtags, such as #bluehousemoments.



(Docket Entry No. 186-8 at DX-98 at 21)

On top of the fact that the plaintiff does not make or market a tequila soda, the plaintiff uses very different trade dress, advertising, and marketing for its bottled products. Those are described in more detail below, in comparing the plaintiff's and the defendant's bottled distilled tequilas. The similarity in sound between "CLASE AZUL" and "CASA AZUL," also described in detail below, does not give rise to a likelihood of confusion given the differences between the products. The record evidence shows no likelihood of confusion between the plaintiff's bottled distilled tequilas and the defendant's canned tequila sodas, and no infringement.

## III. The Bottled Tequilas

### A. The Plaintiff's Clase Azul Tequila

The plaintiff sells expensive luxury tequilas and mezcal under the trademark CLASE AZUL. The words, "CLASE AZUL" translate from Spanish to English as "blue class" or "blue category." (Docket Entry No. 178 at 123:22-23). In the early 2000s, the plaintiff's founder, Arturo Lomeli, chose this name for his new tequila brand. (Docket Entry No. 177 at 45:20-46:5). Lomeli knew at the time that the AZUL name was already in use by another tequila brand. (*Id.* at 47:8-15; 117:15-17). Indeed, the word "AZUL" is commonly used in naming tequilas, because it means

"blue," the color of the agave plant from which tequilas are made.  Lomeli did not think consumers would confuse CLASE AZUL with brands containing the word AZUL. (*Id.* at 119:4-11. 40).

The plaintiff's logo is a circle with four tan leaves and four dark blue "feathered" brushstrokes, which are meant to evoke the blue agave plant from which all tequilas are distilled. The plaintiff's distilled tequila has an alcohol content of 40%. (Docket Entry No. 186-9 at DX-103). The plaintiff's tequila is not organic.  It contains additives, including vanilla, artificial sweeteners, caramel coloring, and glycerin. (Docket Entry No. 179 at 20:2–21:3). The plaintiff refers to its different varieties of tequila as its "icons." (Docket Entry No. 177 at 54:8-13). Its first "icon" is its "plata tequila," which is not aged, is clear, and comes in a clear bottle. (*Id.* at 54:20-55:3, 56:6-14). The plaintiff's plata tequila retails for $135 to $155 and makes up approximately 15 percent of the plaintiff's sales. (Docket Entry Nos. 186-4 at DX-076, 177 at 65:15-17). The plaintiff's plata tequila is sold in bars and restaurants for a suggested price of $35 to $55 for a 2-ounce serving. (Docket Entry Nos. 186-4 at DX-076).

(Docket Entry No. 187-11 at PX-073)

The plaintiff's second "icon" is its reposado, which is aged for eight months and sold in a blue and white hand-painted artisan ceramic decanter. (Docket Entry Nos. 187-11 at PX-074, 177 at 57:3-17). The plaintiff describes this as its "most iconic" icon and its "most popular" tequila. (*Id.* at 57:15-17, 66:9-11). The plaintiff's reposado retails for $165 to $185 and is sold in bars and restaurants at approximately $40 to $60 for a 2-ounce serving. (Docket



(*Id.* at PX-073)

Entry Nos. 186-4 at DX-076). This reposado makes up about 60 percent of the plaintiff's sales. (Docket Entry No. 177 at 65:18-21).

The plaintiff's third "icon" is its añejo tequila, which is aged for 25 months and sold in a blue and white hand painted ceramic decanter with a silver top. (Docket Entry Nos. 187-11 at PX-071, 177 at 58:10-21). The plaintiff's añejo retails for at least $530 and is sold in bars and restaurants for a suggested price of over $120 for a 2 ounce serving, and makes up about 8 percent of the plaintiff's sales. DX-076; (Docket Entry No. 177 at 65:22-23).

The plaintiff's fourth "icon" is its gold tequila, a blend of its plata, añejo and extra añejo tequilas. (Docket Entry Nos. 187-11 at PX-075, 177 at 60:18-25). This gold tequila retails for at least $190, is sold at bars and restaurants for a suggested price range of $70 to 95 for a 2 ounce serving, and it accounts



(Docket Entry No. 187-11 at PX-075)

for about 15 percent of the plaintiff's sales. (Docket Entry Nos. 186-4 at DX-076, 177 at 61:3-4, 66:1-2).

The plaintiff's fifth "icon" is its ultra tequila, which is aged for 5 years and sold in a black ceramic decanter hand-painted with platinum and adorned with a 24-carat gold label. (Docket Entry Nos. 187-11 at PX-077, 177 at 61:16-17; 62:6-7). The plaintiff's ultra tequila retails for approximately $2,000, is sold in bars and restaurants for over $475 for a 2-ounce serving, and makes up about 2 percent of the plaintiff's sales. (Docket Entry Nos. 186-4 at DX-076, 177 at 61:22-24, 66:3-5). The plaintiff also frequently releases limited-edition bottles for different occasions. (Docket Entry No. 177 at



(Docket Entry No. 187-11 at PX-077)

8

75:13-22). For the plaintiff's 15-year anniversary, it sold 15 bottles of a limited-edition tequila, priced at $30,000 per bottle. (*Id.* at 82:25-83:9; 120:7-13).

The most distinctive aspect of the plaintiff's CLASE AZUL products is the containers. They are most commonly sold in tall, blue and white hand painted artisanal 750-milliliter ceramic decanters with a silver "bell" top that twists off. (Docket Entry Nos. 187-11 at PX-077, 177 at 55:19-23; 57:15-17; 65:18-21; 66:9-11; 120:2-6; 123:18-19). Ringing the silver bell top when the product is opened or poured is part of the CLASE AZUL serving ritual. (Docket Entry No. 179 at 23:6-24:2). The plaintiff's decanters are unique and distinctive. (Docket Entry No. 177 at 123:7-14). They are often gifted, upcycled, or displayed. (*Id.* at 123:3-124:7). All of the plaintiff's tequilas, from its lowest-priced plata to its highest priced limited-edition versions, are sold in decanters with the same distinctive shape. (Docket Entry Nos. 187-11 at PX-074, 177 at 56:15-17; 76:17-20; 83:10-12).  The ceramic decanters can be in different colors from the most famous blue and white decanter, to make special occasions or special editions of the tequila.  The array includes a pink and white decanter of reposado, a black and gold decanter of ultra añejo retailing for over $2000.  The plaintiff also sells mezcal in hand-painted decanters with the same shape and bell as its tequilas. (Docket Entry Nos. 187-11 at PX-076).



(Docket Entry No. 187-11 at PX-076)

The plaintiff considers its ceramic decanters to be one of its most valuable brand assets, the main distinguishing characteristic from other tequila brands, and a key selling point for the company. (Docket Entry No. 177 at 123:3-14; 124:5-13; *see also* Docket Entry No. 186-1 at DX-

002 ("the push comes from the ceramic bottles, since they are the most easily recognizable"), DX-008 ("instead of just the Clase Azul tequila[] logo, which not everyone recognizes, [a logo] would appear together with the illustration of the bottle, making it easier to identify."). The hand-painted decanters are an integral part of the plaintiff's marketing emphasis on the strong tie between its tequilas and Mexican tradition,

The plaintiff admits that some consumers only know the CLASE AZUL bottle, and do not know the CLASE AZUL name. (Docket Entry No. 179 at 22:9-22:12; 22:19-22:24). On at least one of its most expensive bottles, the "CLASE AZUL" trademark is on an easily removable sticker on the side of the tequila decanter; the name is not displayed to consumers at the time of sale and is designed to be removed after the customer purchases the decanter and displays it. (*See* Docket Entry Nos. 186-1 at DX-015 at 10, 177 at 130:12-131:14). The removable name is intended to make it easier to use the decanters as a decorative object. The absence of the brand name emphasizes the plaintiff's reliance on the distinctive hand painted artisan decanter, rather than the brand name, for consumers to identify its products.

As part of the luxury lifestyle the plaintiff markets, it also creates homewares, candles, tableware, and luggage using the blue agave theme. (*See* Docket Entry Nos. 186-1 at DX-015 at 3, 186-1 at DX-027 at 8, 177 at 77:18-78:10; 84:9-18; 85:4-15; 86:4-9; 86:19-87:4). The plaintiff also maintains "CLASE AZUL DESTINATIONS" in Mexico, such as boutique stores, restaurants, and bars, advertising them as "unique spaces where CLASE AZUL comes to life." (Docket Entry Nos. 186-7 at DX-096, 177 at 152:4-23).

The plaintiff's marketing emphasizes Mexican culture, heritage, and artisanship in an effort to appeal to a sophisticated and affluent consumer than the defendant markets to. (Docket Entry Nos. 186-1 at DX-015 at 35-38, 186-7 at DX-096 at 5-8, 11-12, 177 at 48:22-49:1; 123:18-24).

The plaintiff uses the tag line "artisans of an exquisite life" in its tequila marketing. (Docket Entry Nos. 179 at 32:14-32:17, 186-7 at DX-096 at 12). It focuses its marketing on the exclusivity, origin, and quality of its product. (*See* Docket Entry No. 186-1 at DX-027). The plaintiff markets its product as a tequila for savoring, not mixing in a cocktail. (*See id.* at DX-016). In short, the plaintiff primarily appeals to a customer who is proud of Mexican heritage, artisanship, and tradition, and is wealthy, sophisticated, and discerning about quality tequila. The distinctive decanter is meant to be an enduring emblem of these characteristics for the CLASE AZUL consumer.

The plaintiff does not generally advertise its product. (Docket Entry No. 178 at 201:17-18). The plaintiff's distinctive blue and white reposado tequila bottle has appeared in music videos, television shows and other celebrity media posts—none of which the plaintiff has paid for. (*Id.* at 135:22-24; 136:9-13; 138:21-23; 145:4-5; 208:17-20). These media mentions are largely focused on the plaintiff's distinctive bottle—not its name. (*Id.* at 136:13-23). One exception is the music video of a song titled "Clase Azul," by Ozuna, whose Spanish song lyrics feature the words "Clase Azul" among profanity and references to sex and smoking. The music video does not otherwise feature the plaintiff's bottle or tequila. (Docket Entry Nos. 186-10 at DX-228, 178 at 205:6-16; 206:13-14; 179 at 36:2-37:6).

The plaintiff describes its target consumer as the "conscious connoisseur." (Docket Entry Nos. 179 at 32:8-32:13, 186-1 at DX-027 at 15). The plaintiff's marketing targets older, more affluent individuals in its marketing who are willing and able to spend more for premium tequila and other products that appeal to more sophisticated purchasers. (Docket Entry No. 179 at 32:21-24; 177 at 119:21-120:6). As part of its marketing strategy, the plaintiff sells its tequilas in limited locations, while avoiding retail locations—such as grocery stores—that do not align with its luxury, premium marketing. (Docket Entry No. 179 at 33:24-34:10). The plaintiff's marketing is

reflected in its pricing. The starting suggested retail price for the plaintiff's tequila is $135 for its tequila plata; the prices range to thousands of dollars for limited-edition bottles and the price of a shot can range from $35-$475. (Docket Entry Nos. 186-4 at DX-076, 179 at 31:11-31:23).

In retail stores, the plaintiff's products are often found secured behind the cash register, on high shelves, or in locked display case, because they are so expensive. (Docket Entry Nos. 186-1 at DX-004, DX-005, 177 at 133:24-134:4). The side of the CLASE AZUL bottle that does not have the CLASE AZUL name is the side that is displayed to the consumer. (Docket Entry Nos. 186-1 at DX-004, 186-9 at DX-103, 177 at 125:22-25; 129:15-130:23).

Beyond the taste of the product, which the court does not have evidence to make determinations about, CLASE AZUL is marketed and sold successfully by relying on its bottles and the relative wealth and sophistication of its primary market.

### B.  The Defendant's Casa Azul Tequila

The defendant's CASA AZUL organic bottled tequila spirit is a single-estate,[2] organic and additive-free distilled tequila with an alcohol content of 40%. (*See* Docket Entry Nos. 186-7 at DX-092 at 9-13, 22, 186-9 at DX-105, DX-106, DX-107). There are three types of the defendant's tequila: blanco, reposado, and añejo. After distillation, the blanco tequila is allowed to rest in steel tanks for two to three months; it has a clear color and a strong agave taste. The reposado is aged in American bourbon barrels for four to six months, which results in a richer color and flavor. The añejo is aged in the same American bourbon barrels for 15 or more moths, resulting in a darker, richer color and flavor than the other expressions. (Docket Entry No. 179 at 163:16-164:25).

The bottled tequila is certified organic by the USDA, additive-free, and single estate. (*Id.* at 172:9-18). The market standard retail price for the defendant's bottled tequila is $69.99 for the

---

[2] Single-estate tequila uses agave from a single farm or area of land.

blanco tequila (in contrast with $135-$155 for the plaintiff's), $89.99 for the reposado tequila (in contrast with $165-$185 for the plaintiff's), and $129.99 for the añejo tequila (in contrast with $530.00 for the plaintiff's). (*compare* Docket Entry No. 179 at 168:23-169:4 *with* 186-4 at DX-076).



The defendant's bottled tequila is packaged in frosted or tinted colored glass bottles in aqua-colored hues. (Docket Entry No. 179 at 166:25-167:4). A house-shaped white or blue label is affixed to the front of the bottle and displays the words "CASA AZUL" printed under the image of a house with a double-pitched roof. The defendant's label is not removable, in contrast to the plaintiff's label. The defendant's bottles also have a white or blue neck label bearing the CASA AZUL name. The defendant's labels are visible to the consumer when in the original packaging, unlike the plaintiff's labels. The bottles have a metal stopper top in the shape of the double-pitched roof with "CASA AZUL" engraved below the logo on both sides of the top. The CASA AZUL double-pitched roof logo is

(Docket Entry No. 186-9 at DX-105)



(Docket Entry No. 186-9 at DX-106)

embossed above the large bottle label, and the CASA AZUL name is embossed below the label. (*Id*. at 165:23-166:6, 168:11-12). The signature of the defendant's founder, Lance Collins, is also prominently displayed on the right side of the label. (Docket Entry No. 186-9 at DX-105, DX-106, DX-107). In total, the CASA AZUL name appears seven

times on the bottle. (*See id.*, Docket Entry No. 179 at 166:13-16). The defendant relies on its name for consumer recognition more than the shape or appearance of the container.

In retail stores, the defendant's organic bottled tequila is typically found in the tequila section or in a designated organic or additive-free section. (Docket Entry No. 179 at 182:1-10). The defendant currently sells its products in 28 states. (*Id.* at 179:7-9). The defendant's organic bottled tequila is sold next to other tequilas in the same price range—such as Cincoro, Casa Dragones, and Casamigos—and away from the plaintiff's more expensive tequilas. (Docket Entry No. 179 at 182:11-16, 191:22-192:14). The defendant's and the plaintiff's tequilas are not considered direct competitors, in part because of the plaintiff's high price point. (*Id.* at 192:24-193:18). The defendant's products are sold in off-premises locations, including grocery stores and liquor stores, and big box stores, and in on-premises locations, including restaurants, bars, nightclubs, and sports venues. (*Id.* at 178:6-179:1). The plaintiff's products, by contrast, are not sold in grocery stores or in big box stores. In 2023, the defendant sold 72,000 bottles of Casa Azul organic tequila. (*Id.* at 180:9-180:11).



(Docket Entry No. 186-9 at DX-107)

Since launching its Casa Azul products, the defendant has focused on heavy marketing and digital engagement targeted at younger consumers. (Docket Entry Nos. 186-2 at DX-043, 179 at 60:24-61:2). The defendant's marketing includes two influencer strategies. One is "organic seeding," in which free samples are sent to influencers with requests that they post about the product. The other is "paid influencers" in which the defendant contracts with influencers to promote its products on social media. (Docket Entry No. 179 at 103:10-19). The defendant

14

sponsors events, such as food and wine and music festivals. (*Id.* at 103:20-24). All of these strategies target online consumers who follow influencers and attend festivals—a younger consumer base similar to that of the defendant's tequila soda. The defendant also uses e-mail, social media, and websites to market its bottled tequila. (*Id.* at 103:25-104:4).

The evidence shows that while both companies compete in the sale of tequilas in the United States, they in fact target different consumer markets, using different kinds of advertising, pricing, and image-creation.  These differences reduce any likelihood of confusion that might arise from the similar sound (not meaning) of the product names.

### C.  Other Tequila Brands

During the bench trial, the defendant presented 30 bottles of tequilas with other brands, to show how crowded the market is and how many tequila brands use the words AZUL or CASA. (*See* Docket Entry No. 176 at 29–30). The court finds that the large number of tequila brands, and the frequent use of the words "Casa" and "Azul" in those brand names, show that the names "Clase Azul" and "Casa Azul" are two in a large group of similar brand names for tequilas.

"Azul" is common in tequila brand names because it is descriptive of the main ingredient in tequila, the blue weber agave. (Docket Entry No. 179 at 196:20-197:2). The plaintiff is aware of many of these brands and does not find them confusingly similar to CLASE AZUL. (*See* (Docket Entry Nos. 177 at 138:20-23, 138:25-140:24, 186-9 at DX-201 (ARTE AZUL), DX-202 (AROMA AZUL), DX-209 (CAMPO AZUL), 186-10 at DX-241 (CAZUL 100), DX-246 (FLECHA AZUL), DX-251 (AZULEJOS), DX-252 (LUNAZUL); DX-263 (PIEDRA AZUL)). "Casa" is commonly used in tequila brand names because it represents a brand's or a consumer's "house." (Docket Entry No. 179 at 198:16-25). The plaintiff is aware of many of these brands and does not find them confusingly similar to CLASE AZUL. (Docket Entry Nos. 177 at 147:22-148:1,

15

186-10 at DX-220 (CASA DRAGONES), DX-226 (CASA MAESTRI), DX-238 (CASAMIGOS), DX-271 (CASA DEL SOL)).

CAZUL 100 is a third-party brand of tequila sold in the United States that has coexisted with the plaintiff's products for over a decade. (Docket Entry Nos. 179 at 39:7-10; 40:4-6, 42 at 9 ("United States Distilled Products Co., owns the registered United States trademark CAZUL 100. The mark was registered in February 2012. United States Distilled Products Co. sells its tequila under the CAZUL mark in the United States. The plaintiff did not oppose the company's application to register CAZUL 100 for alcoholic beverages, including tequila.")). The plaintiff does not believe that CAZUL 100 is confusingly similar to CLASE AZUL, even though CAZUL 100 contains the letters A-Z-U-L and begins with the letter C. (Docket Entry No. 179 at 41:12-17).

CASAZUL is another brand of tequila sold in the United States sold by a company called Cavazul S.A. de C.V. (Docket Entry Nos. 186-9 at DX-200, 179 at 41:18-24). Up until the fall of 2023, the plaintiff did not oppose the trademark application for CASAZUL in the United States, and the mark was registered. (Docket Entry Nos. 186-9 at DX-111, 179 at 45:23-46:2). The plaintiff sent Cavazul a demand letter on April 30, 2020, alleging that the CASAZUL trademark was confusingly similar to CLASE AZUL. (Docket Entry Nos. 186-1 at DX-025, 179 at 46:15-18). Cavazul did not respond to this letter and continued to sell CASAZUL tequila in the United States for several years. (Docket Entry No. 179 at 46:25-47:5; 47:17-49:14). It was not until after the plaintiff filed the instant lawsuit and lost its motion for a preliminary injunction against the defendant that the plaintiff began to take actions against Cavazul in Mexico, but the plaintiff still has not sought an injunction against the sale of CASAZUL tequila in the United States. (*See id*. at 49:15-19). Indeed, the evidence shows that defendant was able to purchase a bottle of CASAZUL

in from a liquor store in Houston at the start of the bench trial. (*See* Docket Entry No. 186-9 at DX-200).

Finally, the plaintiff (with its tequila) and the defendant (with its wine) peacefully coexisted with these various CASA and AZUL brands for more than fifteen years. See (Docket Entry No. 177 at 140:20-24 (AZULEJOS); 141:11-14 (AROMA AZUL); 142:12-13 (CAMPO AZUL); 143:11-12 (FLECHA AZUL); 144:4-6 (ARTE AZUL); 144:24-145:1 (LUNAZUL); 145:17-19 (PIEDRA AZUL); 146:14-23 (CAZUL 100); 148:20-22 (CASA MAESTRI); 149:22-24 (CASAMIGOS); 151:1-3 (CASA DRAGONES); 151:20-22 (CASA DEL SOL)). The plaintiff has not sought injunctive relief in the United States against any of these third-party tequila brands, including the third-party brands CAZUL 100 and CASAZUL. (Docket Entry No. 179 at 40:7-14; 49:15-19).

## IV.    The Evidence as to Confusion

### A.  Questions Showing Confusion

The plaintiff presented evidence that before the defendant began marketing its tequila, potential investors raised the issue of possible confusion between CASA AZUL and CLASE AZUL, or between CASA AZUL and CASAMIGOS. (Docket Entry Nos. 187-4 at PX-004, 187-14 at PX-188). Collins addressed the concerns by pointing out that he had owned the CASA AZUL trademark for over a decade and that the CLASE AZUL brand was primarily famous for its bottle. These questions were not only about confusion with CLASE AZUL, but with tequila brands that had the name "CASA," as many did, or "AZUL," as many did. (Docket Entry No. 187-5 at PX-013).

The plaintiff presented evidence of instances in which individuals allegedly confused its company, CLASE AZUL, with the defendant, CASA AZUL. None of these instances involved

confused purchases of either party's product by consumers. One was a question put to the plaintiff about a job opening that was in fact posted by the defendant. (Docket Entry Nos. 187-12 at PX-089, 179 at 53:14-25). Others asked the plaintiff if it was aware of the defendant's products and if the plaintiff was concerned about the potential for confusion. (*Id.* at 56:19-24, 57:8-10). As the defendant points out, the questions reveal that the questioner was not confused. The plaintiff notes the fact that a large liquor distributor, Southern Glazer's Wine and Spirits, LLC (SGWS), declined to distribute the defendant's products. The Senior Vice President of SGWS, Louis Zweig, testified that SGWS had been a long-time distributor of the plaintiff's products and did not want to endanger that relationship by also distributing the defendant's products. (Docket Entry No. 187-15 at PX-225). Finally, the plaintiff presented evidence that its employees were sometimes contacted to ask if they knew the defendant's employees. (Docket Entry No. 177 at 212:25-214:3). These examples do not involve consumers.

The defendant presented evidence that there was confusion about the plaintiff's brand name with other products, long before the defendant began marketing its tequila products. (Docket Entry No. 179 at 50:21-25). The defendant argued that there is no record evidence of any instance in which a consumer purchased either the defendant's canned tequila soda or the defendant's bottled tequila thinking that it was the plaintiff's product. The plaintiff responds that the three-tiered distribution center (from the defendant to a distributor, which sells to a licensed retailer, which sells to the consumer) makes it difficult for them to identify any instances of actual customer confusion. (Docket Entry No. 178 at 131:8-12). Even with this difficulty, however, sales transactions in particular retail outlets, such as bars, restaurants, or grocery and liquor stores, could be monitored by targeting specific physical locations to identify instances of confusion. No such evidence was presented.

### B.  Social Media Evidence

The plaintiff presented evidence that some social media users had tagged[3] the defendant's Instagram account in almost 40 posts that showed CLASE AZUL products or other items with the distinctive blue and white design that CLASE AZUL uses to decorate its decanters. (Docket Entry No. 179 at 78:14-80:25, 81:21-5).  The posts were made before CASA AZUL was marketed as tequila. (*Id.* at 80:3-6; 127:10-230). The defendant's Instagram account also had tagged photos with other brands including Macallan, Casamigos, Espolon Don Julio 1942, and 1800. (*Id.* at 130:2-8).

When the defendant learned of the posts, it removed the tags and changed the settings on its Instagram account. (*Id.* at 127:10-23). The defendant now manually screens posts before they appear to ensure that they are related to CASA AZUL. (*Id.* at 78:14-80:25, 81:21-5).  The screening is intended to ensure that posts or tags showing another tequila brand or a different subject are not posted or displayed. At the time of trial, the tagged part of the defendant's Instagram page does not show anything related to CLASE AZUL or other brands besides CASA AZUL, and neither party introduced evidence as to how many mis-tags currently occur.

The evidence of the posts and tags made before the defendant instituted the screening program is not persuasive evidence of consumer confusion. Erroneous tags on Instagram accounts are common and easily made, and the mis-tags were not exclusive to CLASE AZUL. (*Id.* at 131:2-8). The comments posted on the defendant's Instagram account have not been about CLASE AZUL, and the parties did not introduce evidence that the defendant screens its comments as well as its tags.

---

[3] "Tagging" on Instagram refers to including the official name of another account (preceded by "@") within a post or image in order to interact with or gain the attention of the other account.

The plaintiff does not advertise its products as extensively as the defendant. But like the defendant, the plaintiff uses social media influencers. The plaintiff's product is featured in magazines, particularly those aimed at luxury-product consumers, and featured in films and television. The plaintiff explains that its brand is so popular that it does not need to advertise in a "traditional" way. (Docket Entry No. 178 at 201:17-202:11).

The mis-tagging of CASA AZUL on social media shows that there may be some minor confusion in sound because CLASE AZUL does not focus its marketing on its name, potentially causing consumers to forget exactly the name of the drink. The mis-tagging, however, does not show any swayed purchases, the hallmark of actual confusion. The issue of confusion in sound is addressed below, but the social media or advertising evidence does not show a likelihood of consumer confusion between the plaintiff's CLASE AZUL and the defendant's CASA AZUL.

**C. Survey Evidence**

Both parties presented consumer perception survey evidence on both the canned tequila soda product and bottled tequila products. The surveys were designed to determine whether consumers of either the tequila soda product or the bottled distilled tequila products are likely to mistakenly believe that the defendant's products are made or distributed by, is sponsored or approved by, or affiliated or connected with, the plaintiff's products.

The defendant's surveys were done by Matt Ezell, who the court found qualified as an expert on surveys. Ezell used the Everready methodology for assessing likelihood of confusions. The plaintiff presented survey evidence as well. Dr. Isabella Cunningham, also qualified as a survey expert, used "modified" Squirt methodology to test the likelihood of confusion between consumers or potential consumers of the defendant's canned tequila soda and the plaintiff's

distilled bottled tequila. Unlike, Ezell, Dr. Cunningham did not test the likelihood of confusion between the plaintiff's and defendant's bottled tequilas.

In Ezell's canned products survey, prospective purchasers of canned cocktails were shown CASA AZUL and asked questions designed to measure the potential for "source confusion," "sponsorship confusion," and "affiliation confusion." The result showed that less than one percent (0.33%) of those surveyed believed that there was any connection between the defendant's CASA AZUL canned tequila soda and the plaintiff. (Docket Entry No. 186-5 at DX-081 at 8).

In Ezell's bottled products survey, respondents were shown images of three bottles of the defendant's bottled tequilas—blanco, reposado, and añejo—and were asked the same questions used in the canned products survey to measure the potential for confusion with the plaintiff's bottled tequilas. The result was that 4.81% of consumers believed that the defendant's bottled tequilas were affiliated with or sponsored by the plaintiff. (Docket Entry No. 186-6 at DX-082 at 98). This survey used a control group as well. The respondents in this group were shown a bottle of a fictitious tequila with the label "AGAVE AZUL." The name was chosen for the control group because there are many tequilas on the market using the word "AZUL" that are not alleged to infringe. (Docket Entry Nos. 186-6 at DX-082 at 99, 180 at 27:11-15).  Ezell found that 3.11% of the respondents believed that the made up "AGAVE AZUL" bottled tequila was affiliated with, or sponsored by, the plaintiff. (Docket Entry No. 186-6 at DX-082 at 170). Ezell concluded that the results of the bottled products survey showed that less than two percent (1.70%) of the respondents believed that the defendant's bottled tequila was affiliated with, or sponsored by, the plaintiff. (Docket Entry No. 186-5 at DX-80 at 3).  Ezell testified that courts typically use a 10% threshold to measure likelihood of confusion.  (Docket Entry No. 180 at 43:8-12).

Dr. Cunningham testified as a rebuttal expert to Mr. Ezell. She opined the Eveready methodology was improper because, according to Dr. Cunningham, the plaintiff's CLASE AZUL trademark is not a brand of tequila that is top of mind and so survey respondents taking Mr. Ezell's surveys would not recall the plaintiff's CLASE AZUL brand when shown the defendant's products and would instead read the name of the defendant's products off the label. (Docket Entry No. 178 at 73:12-74:17, 71:9-16, 74:18-75:11). She testified that an Eveready survey is not appropriate when the parties' products are proximate, because the format deflates the confusion rate. (*Id.* at 70:20-71:6). Finally, Dr. Cunningham claimed that Mr. Ezell's Canned Products Survey did not use the correct survey population because he did not limit the population to purchasers or prospective purchasers of tequila soda product. (*Id.* at 77:19-79:13).  Given that the plaintiff's argument hinges on the strength of the CLASE AZUL brand, and that the plaintiff's and the defendant's products have been shown not to be sold proximately, the court finds that Dr. Cunningham's arguments do not undercut the conclusions of the Ezell survey.

In Dr. Cunningham's survey, respondents were shown an image of the plaintiff's CLASE AZUL tequila with the bottle next to the box, followed by either the defendant's CASA AZUL canned tequila soda in a box and a can out of the box, or a similar display of a canned tequila soda made to look like the defendant's but using the name "LOMA BLANCA." (*Id.* at 36:23-37:2, 37:12-19, 90:12-91:9). The survey respondents were then asked whether they thought that the two tequila beverages were made or put out by the same or different companies, and why; whether they thought that the companies making the two tequila beverages were affiliated, and why; and whether they thought the defendant's product or the control product did or did not need permission from another company to use the brand name, and why. (*Id*. at 41:15-43:1, 112:13-24). Dr.

Cunningham concluded that the survey she performed demonstrated 29.2% net confusion. (*Id.* at 53:19-22).

Sarah Butler, a qualified survey expert, testified on behalf of the defendant that Dr. Cunningham's survey method was unreliable. (Docket Entry No. 179 at 243:22-244:6).   She opined that the Squirt methodology Dr. Cunningham used was not appropriate because the Squirt method is accurate only when the marks or products at issue appear proximately in the marketplace. Dr. Cunningham failed to account for the fact that even when the plaintiff's bottled tequilas and the defendant's canned tequila are sold in the same stores, they are not placed in the same location within the store. (*Id.* at 231:12-21; 235:21-236:2). Butler also noted that Dr. Cunningham's survey only used two products, and the control products did not use the word "Azul" and were improperly leading. (*Id*. at 251:24-252:2, 240:18-241:3; 241:12-242:2; 242:25-243:1).  The plaintiff acknowledges that Cunningham's survey was flawed but urges the court to give it "some weight." (Docket Entry No. 173 at 74).

The court finds that Ezell's surveys were reliable, and that Dr. Cunningham's surveys were not. The problems Butler noted are valid concerns that undermine the reliability of Dr. Cunningham's survey results.  Dr. Cunningham used an improper survey methodology that did not reflect the ways the products appear in the marketplace. Ezell used a methodology appropriate to the actual marketing of the products at issue. Ezell's methodology was the more reliable method of assessing the likelihood of consumer confusion between the plaintiff's bottled tequila and the defendant's canned tequila soda and its bottled tequila. The survey evidence does not show a likelihood of consumer confusion.

### D.  Potential Confusion Scenarios

The plaintiff argues that the distinctive appearance of its bottles does not prevent confusion from occurring because approximately 61% of the accounts that sell the plaintiff's CLASE AZUL products are bars and restaurants. In such a setting, a consumer orders tequila off the menu by asking for the tequila by its brand name. In such a setting, the consumer does not see the bottle, and the drink is served in a glass without branding. The plaintiff suggests that it is easy for a consumer, or a server, to confuse an order for CLASE AZUL with an order for CASA AZUL, depriving the plaintiff of revenue. (Docket Entry No. 177 at 102:14-21). The plaintiff further suggests that if the consumer receives CASA AZUL by mistake and likes it, in part because it is a less expensive option, that can represent a further loss of revenue.

The plaintiff acknowledges that because it sells through distributors, it does not receive reliable information concerning the consumers who purchase at retail, and has no evidence that this scenario has actually occurred. The court finds this scenario unpersuasive, as the plaintiff's scenario does not account for the fact that while the brand names are similar, the prices are not. A consumer would quickly realize that the two brands are different because one is much more expensive than the other. In addition, in many bars and restaurants with bars, the bottles and decanters are displayed, which would allow a consumer to see the plaintiff's distinctive decanter, further reducing the likelihood of a misplaced order.

### E.  The Linguistic Evidence

Both parties presented linguistics experts to testify as to whether the way the words "CLASE AZUL" and "CASA AZUL" are pronounced is likely to confuse potential consumers. Dr. Pablo Requena, a linguistics professor at the University of Texas at San Antonio, testified for the plaintiff. The defendant submitted the report of Dr. Robert A. Leonard, a tenured professor of linguistics, who did not testify live because he was doing research in Africa. Neither linguist

examined the brand names in the context of how the named products appear in the marketplace. In that context, the products have only one commonality: they contain tequila and one word out of two in their names: AZUL. But AZUL is a common name for a number of tequilas; that is far from enough to find confusion.

Dr. Requena opined that the sound and pronunciation of the marks could be "confusingly similar[]" for consumers. (Docket Entry No. 187-13 at PX-131 at 3). Dr. Requena found at least two instances on YouTube of individuals pronouncing "CLASE" as "CASA." (Docket Entry No. 178 at 7:17-9:18). Dr. Leonard analyzed the sight, sound, and meaning of the words, and found that while the sounds may be similar, the sight and meaning were not, reducing the likelihood of confusion. (Docket Entry No. 186-6 at DX-88 at 39). The linguists agreed on one thing: the words can be carelessly spoken and carelessly heard. Individuals may fail to pronounce "CLASE" as "klas-ay," instead pronouncing it as "kass-uh" or "klas-uh." Individuals may hear "CLASE" as "CASA," or may hear "CASA" as "CLASE."

To bear down on the difference between "CLASE" and "CASA," and to repeat the obvious, they have two different meanings. An English speaker with even a rudimentary knowledge of a few Spanish words knows that "casa" means "house." The word "clase" is closely related to the word "class," as in "category" or "type," or "class" as in a school class, or a category of a certain quality. The difference in meaning is one basis to find a lack of a significant potential for confusion.

### F.  Whether There Is Confusion

CLASE AZUL's bottled distilled tequila does not compete with CASA AZUL's canned tequila soda. CLASE AZUL is a bottled distilled premium high-priced tequila, sold in a distinctive artisan hand-painted blue and white ceramic decanter. CASA AZUL's canned tequila soda cocktail

is a soda with some tequila. It is a casual and inexpensive drink sold in cans. There is no significant likelihood of confusion between them. Although some hard liquors have an affiliated canned soda with some of the hard liquor as an ingredient, nothing in CASA AZUL's marketing of its canned soda suggests a relationship to CLASE AZUL. The packaging, marketing, and pricing are too far apart to present a significant risk of consumer confusion.

Both parties make a bottled tequila that has three varieties, distinguished by how long they are aged. The oldest of each is the most expensive category. But CLASE AZUL stands out and is easily differentiated from CASA AZUL in at least three respects. First, with respect to each of the three varieties — blanco, reposada, and añejo— CLASE AZUL is much more expensive. Second, CLASE AZUL is primarily marketed in the distinctive hand-painted artisan ceramic decanter. CASA AZUL is one of many tequilas sold in bottles. They do not look alike, and they are not similarly priced. They are marketed in different ways; CLASE AZUL does not "advertise," instead relying on its reputation as a luxury product for the wealthier, more discerning client and appearing in magazines or media outlets catering to such clientele. The one pop music video appears to be out of step with CLASE AZUL's self-branding, and the plaintiff was not involved in producing the video. CASA AZUL advertises with internet celebrity endorsements, in-store demonstrations, and sales at music festivals and concerts—none of which CLASE AZUL does. CASA AZUL is marketed as an organic tequila that is free of additives, appealing to a younger potential consumer who wants to spend less money for a good quality product. CLASE AZUL is marketed as a high-end luxury product, closely associated with its distinctive high-quality hand-painted ceramic decanters, intended for a discerning and selective consumer.

## CONCLUSIONS OF LAW

### I.      Jurisdiction and Venue

The plaintiff alleges trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); false designation of origin and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and trademark infringement and unfair competition under Texas common law.

The court has subject-matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and has supplemental jurisdiction under 28 U.S.C. § 1367(a). The defendant is subject to personal jurisdiction because it conducts business in the State of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042.

Venue is proper under 28 U.S.C. §§ 1391(b) and (c), because the defendant does business in this district.

### II.     Trademark Infringement

A defendant is liable for trademark infringement under the Lanham Act if it uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (quoting 15 U.S.C. § 1114(1)(a)). There is no dispute that the plaintiff owns trademark rights in "CLASE AZUL" and therefore has a legally protectable, valid mark. (*See* Docket Entry No. 176 at 57–58).

Where there is a valid mark, "[l]ikelihood of confusion" is "the paramount question" in a trademark infringement action. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440,

453 (5th Cir. 2017). "Likelihood of confusion is synonymous with a probability of confusion, which is more than mere possibility of confusion." *Springboards to Educ.*, 912 F.3d at 812 (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). Likelihood of confusion is assessed using the following factors, also called "digits of confusion":

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,]' . . . [and] (8) the degree of care exercised by potential purchasers.

*Streamline*, 851 F.3d at 450 (quoting *Bd. of Supers. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)).  No single factor is dispositive.  *Id.*  The court examines each factor and determines that there is not a likelihood of confusion.

### A.  Strength of the Mark

In considering the strength of a mark, a court analyzes "(1) the mark's position along the distinctiveness spectrum, and (2) the standing of the mark in the marketplace." *Springboards*, 912 F.3d at 814 (quoting reference omitted).  The strength of a mark depends on whether the mark is classified, from least protectable to most protectable, as: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020).

Arbitrary or fanciful marks have no relation to the trademarked product.  *Springboards*, 912 F.3d at 814.  Suggestive and descriptive marks suggest or describe attributes of the product. Suggestive marks "suggest" a particular attribute but "require[] the consumer to exercise his imagination to apply the trademark to the good."  *Id*.  Descriptive marks more directly "convey[] information about the product or service."  *Id*.  Descriptive marks are "comparatively weak." *Future Proof Brands*, 982 F.3d at 292.  "If the common element in the conflicting marks is suggestive or descriptive of the goods or services, this lessens the likelihood of confusion." 4

McCarthy on Trademarks and Unfair Competition § 23:48 (5th ed.) (collecting cases). Marketplace recognition depends on public recognition and uniqueness. *Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of Law, Inc*., 214 F. Supp. 3d 573, 585 (S.D. Tex. 2016).

At the preliminary injunction stage, this court found that the CLASE AZUL mark was not strong. (Docket Entry No. 42 at 14).  The term "CLASE AZUL" translates to "blue class." (Docket Entry No. 178 at 123:22-24). The shared term "AZUL" is descriptive of "the blue weber agave plant from which tequila is made." (Docket Entry No. 42 at 14).  CLASE AZUL is a descriptive mark describing the type of alcohol, and the higher class of tequila, contained in its brand. Further, the evidence establishes that the CLASE AZUL mark is not driving marketplace recognition. The plaintiff's marketplace recognition primarily hinges on its distinctive, hand painted blue-and-white bottles, to such an extent that the plaintiff even makes its "CLASE AZUL" labels removable or hidden on the side of the bottle.

Finally, "[e]xtensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user." *Springboards*, 912 F.3d at 815.  The terms "casa" and "azul" have been used extensively in the tequila market. The extensive third-party use of the disputed terms diminish the strength of the CLASE AZUL mark. *Amstar Corp. v. Domino's Pizza, Inc*., 615 F.2d 252, 259–60 (5th Cir. 1980) (evidence of 72 third-party registrations and 15 third-party uses of the DOMINO mark, for both related and unrelated goods, limited the protection that mark).

The court concludes that the CLASE AZUL mark is not strong, weighing against finding a likelihood of confusion.

**B.  Similarity of Marks**

Courts examine the similarity of the marks of by "comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters*. 141 F.3d at 201.  Similarity is assessed by comparing the marks as a whole, not by isolating their constituent elements. *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317–18 (5th Cir. 1981).  Mere shared words or phrases are not determinative. *See, e.g.*, *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1156 (10th Cir. 2013) ("SinuSense" and "SinuCleanse" sound different despite the use of "Sinu" in both marks); *Sun Banks*, 651 F.2d at 318 ("SUN BANKS" and "SUN FEDERAL" were not similar in appearance given the "significant" fact that neither party used the shared word by itself.).

What words mean, in addition to how they sound and appear, matters.  *See, e.g.*, *Seven-Up Co. v. Tropicana Products, Inc.*, 356 F.2d 567, 568 (C.C.P.A. 1966) ("[T]he meaning of words in trademarks is often an important consideration in determining whether likelihood of confusion exists."); *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 775 (S.D. Tex. 2005), *aff'd*, 205 Fed. Appx. 289 (5th Cir. 2006) (finding that meaning of "Star Bock Beer" "could easily be distinguished" from "Starbucks").

Courts have found no likelihood of confusion between foreign-language words that, despite sounding similar, have different meanings when translated to English.  *See, e.g.*, *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. 05-CV-0587, 2005 WL 701599, *5 (N.D. Cal. Mar. 23, 2005) (The word marks "ménage à trois" and "mélange de trois" for wine were "distinctly different" because even though they sounded similar, they had dissimilar meanings when translated from French.); *see also La Mexicana, Inc. v. Sysco Corp.*, No. 97-CV-562R, 1998 WL 929629, at *4 (W.D. Wash. May 27, 1998) ("CASA is easily translated by non-Spanish speaking consumers.").

Trade dress is "not the sole or always the most important factor" in trademark-infringement cases. *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 219 (5th Cir. 1985). "[C]ourts consider marks in the context that a customer perceives them in the marketplace, which can include labels, packages, or . . . advertising material directed to the goods." *Future Proof Brands*, 982 F.3d at 295 (internal quotations omitted) (holding the district court did not err in "focus[ing] on certain visual differences in *product packaging*").

As the court found above, the meaning of each name is plainly different, even to English speakers. The sight of the terms is also plainly different. The term "CLASE" includes an extra letter and ends with a different letter as compared to "CASA." (Docket Entry No. 186-6 at DX-088 at 19). It is true that the sound of the names may be similar to English speakers, especially when considering mispronunciation of the term "CLASE" as "kass-uh" or "klas-uh." But the sight and meaning of the terms are dissimilar.

When considered in the context of the trade dress, the dissimilarity between the marks widens. As the court found, the appearance of the bottles themselves are entirely different. The CLASE AZUL mark is viewed in the marketplace in the context of the plaintiff's hand painted blue-and-white decanter with the silver bell top. The labels bearing the name CLASE AZUL are not the main visual identifiers for consumers of the plaintiff's brand. By contrast, the defendant's products contain a prominent CASA AZUL logo set within a teal and white house, in a standard shaped frosted or tinted glass bottle.

Although the sound of the trade names is similar, the visual appearance and the meanings are different. Add to these differences the context in which the products are sold: the differences in packaging, pricing, marketing, and messaging, among others. Viewed in context, the phonetic

similarity in the names taken alone does not equate to a substantial likelihood of confusion in the purchase decisions made by potential consumers.

### C.  Similarities of Products

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Xtreme Lashes, LLC*, 576 F.3d at 229. "[D]irect competition between the parties' products is not required in order to find a likelihood of confusion." *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 666 (5th Cir. 2000). However, differences between the products "reduce the likelihood of confusion in the minds of potential purchasers."  *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 172 (5th Cir. 1986). The question is whether a consumer might "make the unconscious judgment that related products with the same mark must come from a common, albeit anonymous, source." 4 McCarthy on Trademarks and Unfair Competition § 24:3 (5th ed.). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*, 80 F.4th 607, 622 (5th Cir. 2023).

The defendants' canned tequila sodas are plainly dissimilar products to the plaintiff's tequilas. (*See* Docket Entry No. 42 at 17–18).  The question is whether the defendants' bottled tequila are similar to or in competition with the plaintiff's bottled tequila.  Both parties produce a distilled tequila with an alcohol content of 40%. But this is where the similarities end. For every type of tequila—blanco, reposado, and añejo—the plaintiff's product costs between 2 to 5 times the defendant's product. The plaintiff produces a luxury sipping tequila. The defendant, unlike the plaintiff, produces an organic, additive-free lower cost tequila. These differences can be significant in the drinks market. *See Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co., LLC*, No. 1:21-CV-161, 2021 WL 5568159, at *8 (W.D. Tex. Nov. 28, 2021) (analyzing the

similarity of the products and noting "both are sparkling beverages" but that plaintiff's products have "flavors" and defendant's product "contains alcohol and is not flavored beyond the addition of tonic.").

When considered within the context of the tequila market, the court concludes that the products themselves are not similar.

### D.  Similarity of Consumers and Stores

"Differences in the parties' customer bases can lessen the likelihood of confusion." *Healix Infusion Therapy, Inc. v. Healix, Inc*., No. 17-CV-357, 2018 WL 1801149, at *14 (S.D. Tex. Apr. 16, 2018); *see also Amstar*, 615 F.2d at 262 (noting that the "substantial dissimilarities between the predominant purchasers of plaintiff's and defendant's products" lessen the possibility of confusion).  Store placement plays a significant role in determining this factor. *See Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 296 (S.D.N.Y. 2003) (the plaintiff's and the defendant's magazines were sold in the same retail outlets, but were "unlikely to appear in physical proximity to each other at such outlets," which favored the defendant); *see also Sunenblick v. Harrell*, 895 F. Supp. 616, 639 (S.D.N.Y. 1995) (two records "sold in separate sections of [the same] record stores" were not "commercially proximate," which favored the  defendants).

Although the plaintiffs argue that the products are sold in the same stores and same online retail channels, the evidence does not show a similarity in consumer base or store placement. First, the plaintiff's products are not sold in grocery stores or in big box stores, while the defendant's products are sold in those outlets.  Second, even when the products are sold in the same stores, the defendant introduced evidence showing that its product is sold either in a designated organic or additive-section, or next to other tequilas in a similar price range, like Casamigos. (Docket Entry No. 179 at 182:1-10, 182:11-16, 191:22-192:14). By contrast, the plaintiff's products are often

locked behind the cash register or in a locked display because their high price makes them targets for thieves. Because of the differences in price point and store placement, the products are likely to be sought or found by different consumers. The significant difference in pricing further distinguishes the two brands of products from one another.

The plaintiff raised the argument that a consumer ordering drinks at a bar or restaurant would not have the significant differences in packaging and placement to aid in avoiding confusion between CLASE AZUL and CASA AZUL.  The difference in price would still be very apparent, and bars and restaurants with bars often prominently display the bottles they are selling from to aid consumers in making their choices.  But the plaintiff provided no evidence that the products are confused or considered similar in the bar and restaurant context.

The court concludes that the parties' products do not have a similar consumer or store base sufficient to create a likelihood of confusion.

### E.  Marketing and Advertising

"[T]he greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion."  *Quantum Fitness Corp. v. Quantum LifeStyle Centers, LLC*, 83 F. Supp. 2d 810, 827 (S.D. Tex. 1999).  Where parties "do not advertise in identical magazines" but "target the same class of buyers" with the same types of advertising channels, there is an inference of similarity. *Xtreme Lashes, LLC*, 576 F.3d at 229.

As discussed extensively in the findings of fact above, the parties' advertising is highly dissimilar. The defendant's marketing emphasizes the "CASA" portion of its mark, using slogans like "mi casa es su casa" and hashtags focusing on home.  The defendant markets to a younger, more "hip" market. On the other hand, the plaintiff's marketing focuses on celebrating Mexican culture, in part by highlighting the work of its artisans in making its ceramic decanters. The

plaintiff has also expanded into other areas of luxury products and branding, with marketing targeted toward high-net-worth individuals. The single music video by Ozuna shared by the plaintiff is unpersuasive in showing that the plaintiff is seeking to appeal to a younger class of buyers.

The court concludes that this digit weighs against a likelihood of confusion.

### F.  Actual Confusion

A showing of confusion requires more than a "fleeting mix-up of names." *Streamline*, 851 F.3d at 457 (confusion must be caused by the trademark used and must "sway" consumer purchases (quoting *Xtreme Lashes, LLC*, 576 F.3d at 230)). "The plaintiff need not, however, prove confusion in actual consumers. Evidence of confusion in others permits the inference of confusion of purchasers." *Soc'y of Fin. Examiners v. Nat'l Ass'n of Certified Fraud Examiners Inc.*, 41 F.3d 223, 228 n.11 (5th Cir. 1995).

Although there was some confusion as to this standard during the ruling on the preliminary injunction, the Fifth Circuit has since clarified that "proof of actual confusion is not limited to actual or potential customers[,]" *Rex Real Est. I, L.P.*, 80 F.4th 607, 627 (5th Cir. 2023), and rejected the approach that actual confusion requires "proof of swayed customer purchases." *Id.* at 624. The Fifth Circuit explained that "very little proof is required when customer purchases were actually swayed. However . . . more is required when the confusion did not or cannot sway purchases." *Id.* at 625. "[P]roof of actual confusion not involving swayed customer purchases should be weighed against the parties' total volume of sales" as well as the total volume of advertising. *Id.*  Where the record contains "isolated instances of uncertainty" by individuals who were not confirmed to be "potential customer[s]" the weight given to this confusion is minimal

and may be minimized due to "countervailing circumstances" in the other digits of confusion. *Sun Banks*, 651 F.2d at 319.

Finally, in order "[t]o prove infringement, [the defendant] must ultimately prove that a misleading representation by [the defendant], as opposed to some other source, caused a likelihood of confusion." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004).

The plaintiff put forth three categories of evidence showing "actual confusion." First, the plaintiff sought to prove that multiple individuals contacted it with questions about the defendant. This includes at least one individual searching for a job who contacted the plaintiff about a job description posted by the defendant. (Docket Entry No. 179 at 53:14-25). This group also includes individuals who asked the plaintiff if it was aware of the defendant's products and if the plaintiff was concerned about the potential for confusion, which show a *lack* of confusion by the questioner. (*Id.* at 56:19-24, 57:8-10).   The plaintiff also presented evidence that its employees were sometimes contacted to ask if they knew the defendant's employees. (Docket Entry No. 177 at 212:25-214:3). None of these anecdotes involve consumers, and only one appears to plainly involve a confused job-seeker—who later acknowledged he was moving too quickly when he made the error.

Second, the plaintiff presented evidence of mis-tags on social media as evidence of actual confusion. However, the defendant showed both that erroneous Instagram tags are common and easily made, and that it was also tagged in photos of other brands, such as Casamigos. (Docket Entry No. 179 at 130:2-8). There is no evidence that these individuals were actual consumers, or that they were swayed in their purchases—on the contrary, the evidence showed enthusiastic consumers of CLASE AZUL tequilas.

Third, the plaintiff presented survey evidence by Dr. Cunningham, and the defendant presented survey evidence by Ezell, discussed extensively above in the findings of fact. The court credits Ezell's Eveready survey and his finding that only 1.7% of survey respondents believed the defendant's bottled tequila was affiliated with the plaintiff, far below the 10% threshold used to measure likelihood of confusion. (Docket Entry No. 180 at 43:8-12). By contrast, Dr. Cunningham's survey showing a likelihood of confusion did not reflect the way the products appear in the marketplace and was highly leading.

The instances of actual confusion that the plaintiff presents primarily arose when the name of the product was spoken in conversations or referenced in emails or other writing, without reference to and separated from the very different appearance and prices. These all amount to "isolated instances of uncertainty"—the plaintiff provided no evidence showing that these instances were part of any larger pattern of confusion. There is no evidence of swayed purchases, and surveys of potential consumers do not show a likelihood of confusion.

The court concludes that the plaintiff has not shown any actual confusion, weighing against finding a likelihood of confusion.

### G. Intent

The "intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Myo, LLC v. Brull & York, LLC*, 2019 WL 136820, at *6 (W.D. Tex. Jan. 8, 2019) (quoting *Streamline*, 851 F.3d at 455). If there is no evidence of intent, the factor will be neutral.

As this court found at the preliminary injunction stage:

The defendant's 2006 CASA AZUL trademark application for wine was filed four months before the plaintiff filed its intent-to-use application for CLASE AZUL in the United States. For more than fifteen years, the defendant and its predecessor sold Casa Azul wine throughout the United States. The defendant's expansion into the canned cocktail soda

market represents an attempt to capitalize on its existing brand and reputation, rather than an attempt to derive benefits from the plaintiff's brand. The record indicates that the defendant had no intent to trade on the plaintiff's reputation, but rather to trade on the longstanding reputation of its own Casa Azul products.

(Docket Entry No. 42 at 20). The plaintiff argues that the defendant was told prior to launching its tequila that its mark was similar to CLASE AZUL. But the plaintiff has provided no evidence that the defendant intended to benefit from the reputation of the plaintiff, which would be especially hard to prove here where the mark CASA AZUL had long been in use by the defendant.

The court concludes that there is no bad faith on the part of the defendant. This factor is neutral.

### H.  Care Exercised by Purchasers

This digit is often linked to the price of the product.  *Streamline*, 851 F.3d at 458.  However, the Fifth Circuit has "never concluded that a low price is *sufficient* to establish a dearth of care. In fact, [courts] often rely on affidavits or testimony to show a lack of consumer care." *Future Proof Brands*, 982 F.3d at 297.  That a product is "inexpensive only supports a conclusion that those consumers *may* take less care in selecting the items." *Buzzballz, LLC v. JEM Beverage Co., LLC*, No. 15-CV-588, 2015 WL 3948757, at *5 (N.D. Tex. June 26, 2015).  This is not as important of a digit as the rest—"a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar." *Xtreme Lashes, LLC*, 576 F.3d at 231.

The plaintiff argues that there is no heightened degree of care. (Docket Entry No. 173 at 76).  The plaintiff focuses on the defendant's tequila soda product to argue that the low price point weighs against finding a heightened degree of care in purchasing decisions.  That care is a factor, however, when the purchasing choice involves any of the plaintiff's bottled tequilas. "Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and

Bacardi's products, which are differently labeled." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005). When, as here, the prices of the products range from hundreds to thousands of dollars, the consumers of the products can be presumed to exhibit some amount of care in their decisions.

This factor is not particularly strong in light of the other digits, but weighs slightly against finding a likelihood of confusion.

### I.   Balancing the Factors

Six of the factors weigh against finding a likelihood of confusion, and two are neutral. When, as here, there is no evidence of actual confusion or swayed consumer purchases, and the marks are for dissimilar products in a crowded market, there is not a likelihood of confusion between the products. The defendant is not liable for trademark infringement.

### III.   Cancellation of Trademark and Injunctive Relief

"To establish a reasonable basis for a belief that one is damaged by the registration sought to be cancelled, a petition may assert a likelihood of confusion which is not wholly without merit." *Lipton Indus., Inc. v. Ralston Purina Co*., 670 F.2d 1024, 1029 (C.C.P.A. 1982); *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298 (Fed. Cir. 2020).

"To obtain an injunction for trademark infringement, a party '[f]irst . . . must prove that the name he seeks to protect is eligible for protection. He must then prove he is the senior user . . . . [H]e must then show a likelihood of confusion between his mark and that of the defendant. Finally, . . . he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy.'" *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309–10 (5th Cir. 2008) (quoting *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.,* 909 F.2d 839, 844 (5th Cir.1990)).

Because the plaintiff has not shown a likelihood of confusion, there is no basis for cancellation of the trademark, and no basis to issue a permanent injunction for trademark infringement.

## IV.     Unfair Competition Under 15 U.S.C. § 1125(A)

"[A]s a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). Because there is no likelihood of confusion, there is no basis to find the defendant liable for unfair competition.

## V.     State Law Dilution Claim

Dilution under Tex. Bus. & Com. Code § 16.103 requires that "(1) the plaintiff owns a famous and distinctive mark; (2) the defendant uses the mark in a manner that dilutes it; (3) there is association between the marks due to similarity; and (4) the association is likely to impair the distinctiveness of the mark or harm the reputation of the plaintiff's mark." *Transparent Energy LLC v. Premiere Mktg. LLC*, No. 19-CV-3022, 2020 WL 4678438, at *8 (N.D. Tex. July 28, 2020), *report and recommendation adopted*, No. 19-CV-3022, 2020 WL 4673102 (N.D. Tex. Aug. 12, 2020) (citing *Viacom Int'l Inc. v. IJR Cap. Invs., LLC*, 242 F. Supp. 3d 563, 573 (S.D. Tex. 2017)); *see also Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012) (enumerating same elements as those for claim of dilution under Lanham Act).

A mark is famous if it is "widely recognized by the public throughout [Texas] or in a geographic area in [Texas] as a designation of [the] source of the goods or services of the mark's owner." Tex. Bus. & Com. Code § 16.103(b). "Asserting a claim under the Texas Anti-Dilution Statute implicates the same standards as the Lanham Act." *Springboards to Educ., Inc. v. Kipp Found.*, 325 F. Supp. 3d 704, 718 (N.D. Tex. 2018).

The plaintiff's evidence has failed to establish the strength of the CLASE AZUL mark, let alone a likelihood of confusion. Even if the plaintiff had provided evidence that its brand was widely recognized by the Texas public—which it has not—the evidence shows that it is the blue-and-white hand painted bottle that is the most recognizable element of the plaintiff's brand, not the mark.

Because the plaintiff's mark is not famous and the plaintiff has failed to meet the Lanham Act standards as discussed above, the defendant is not liable for dilution under the state law.

## VI.     Conclusion

The court concludes that the defendant is not liable for trademark infringement, unfair competition, or dilution of the plaintiff's mark.  The plaintiff's application for an injunction and claims for other relief are denied.

SIGNED on April 15, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge